Argued and submitted June 17, 1981, affirmed March 8,
reconsideration denied May 27,
petition for review denied July 7, 1982 (293 Or 373)

# STATE OF OREGON,
*Respondent,*

*v.*

# KENINE ELLEN STEIN,
*Appellant.*

## (No. 80 1058, CA 19174)

641 P2d 1148

Paul J. De Muniz, Salem, argued the cause for appellant. With him on the brief was Garrett, Seideman, Hemann, Robertson & De Muniz, P.C., Salem.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Defendant appeals her conviction for manslaughter in the first degree, assigning as errors (1) the denial of her motion for change of venue and (2) the admission of the state psychiatrist's testimony based on an interview with defendant shortly after she was taken into custody. We affirm.

On May 9, 1980, defendant's 14-month-old son, David, was found dead in his room by a neighbor. When defendant, her husband and four-year-old son returned to their home that evening, they were met by a Linn County Deputy Sheriff, who informed them that he was investigating the death of a child found inside the residence. Defendant's husband told the officer that the child was theirs and had been dead approximately four days. Defendant and her husband were advised of their *Miranda*[1] rights and taken into custody for further questioning.

During the ride to the station, defendant informed the deputy sheriff that David had been on a voluntary spiritual fast for 14 days and had been given only water to drink because he was "possessed by the devil" and refused to close his eyes during prayer. Subsequently, during two taped statements voluntarily given by defendant at 6 p.m. and 7 p.m. on the same day, she explained to the police that she and her husband were commanded by the Holy Spirit to rid David of evil spirits by beating him daily with a "willow" rod and not allowing him to partake of meals until David would bow his head and keep his eyes closed during prayer. Defendant also stated that after David's death, she and her husband washed and annointed the child with oil, expecting his resurrection within three to five days.

Shortly after those statements were recorded, the district attorney called a psychiatrist, Dr. Charles Kuttner, and requested an immediate psychiatric evaluation of defendant. Dr. Kuttner arrived at the station at approximately 8 p.m. on the same evening and interviewed defendant. Subsequently, she was charged with the murder of her son. At trial, defendant admitted the acts which caused her son's death and relied on the defense of mental disease or defect. ORS 161.295(1).

---

[1] *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

■■ Defendant first contends that her motion for change of venue should have been granted because the pervasive news coverage of the events surrounding her son's death and her husband's earlier trial[2] deprived her of a fair and impartial jury. Motions for change of venue are addressed to the sound discretion of the trial court and will not be overturned absent a clear abuse of discretion. *State v. Little,* 249 Or 297, 312, 431 P2d 810 (1967), *cert denied* 390 US 955 (1968). A review of the record and newspaper articles submitted in support of defendant's motion does not persuade us that the trial court exceeded the bounds of its discretion. The press reported no more than had been admitted by defendant. *State v. Wampler,* 30 Or App 931, 934, 569 P2d 46 (1977), *rev den* 281 Or 99, *cert denied* 436 US 960 (1978).

Defendant next challenges the admission of Dr. Kuttner's rebuttal testimony at trial about statements made to him by defendant and expressing his opinion that defendant was not suffering from mental disease or defect at the time of the crime. Two grounds are asserted: (1) defendant was not advised of her full *Miranda* rights prior to the psychiatric examination, and (2) the state has no right to conduct a psychiatric evaluation before notice of a defendant's intent to rely on the defense of mental disease or defect. The state counters that the warnings given defendant prior to the examination were sufficient, but even assuming, *arguendo,* their insufficiency, the doctor's testimony about the statements made to him by defendant was not prejudicial, because similar testimony had already been elicited from defendant, her own psychiatrists and the police. As to the second ground, the state contends that it may properly conduct a psychiatric examination of a defendant, with defendant's consent, without waiting for notice of intent to rely on a psychiatric defense.

■■ The doctor's testimony concerning statements made by defendant to him, even if held to be inadmissible, would be harmless error in light of the cumulative nature of that evidence. The more difficult question relates to permitting the doctor to give his opinion, based on his

---

[2] Before defendant's trial began, her husband was convicted of murder for the death of their child.

in-custody interview with defendant, that defendant did not suffer from a mental disease or defect at the time of the offense.

Dr. Kuttner testified that before interviewing defendant on the night she was taken into custody, he informed her that he had been requested by the district attorney to evaluate her, that the interview would not be a confidential psychiatric interview, that anything she said would be admissible against her in court and that he could testify against her in court. After being so informed, defendant agreed to continue the interview.

Defendant does not dispute the fact that those warnings were given to her, but contends that because Dr. Kuttner failed to advise defendant of her right to assistance of counsel prior to the interview, objection to his testimony should have been sustained. In *State v. Corbin,* 15 Or App 536, 547, 516 P2d 1314 (1973), *rev den* (1974), we held that, notwithstanding an effective waiver of *Miranda* rights during police interrogation about three hours earlier, the defendant, "as a matter of law," had to be readvised that *Miranda* rights apply equally to the psychiatric examination. We explained, however, that the reason for requiring readvice of *Miranda* rights was to

"* * * dispel any possibility that the defendant may believe that statements made to the psychiatrist would not or could not be used in court against him. The reasons for this possible misapprehension lie in the vagueness of what is protected by the confidentiality of the doctor-patient relationship. Even more compelling is the need to dispel any belief that statements made to the psychiatrist would be for the defendant's own good. The defendant must be aware that the psychiatrist is employed by his adversary and is not primarily his healer. * * *" 15 Or App at 546.

Here, although defendant was not readvised of her right to counsel prior to the interview, she was clearly informed that Dr. Kuttner was not acting on her own behalf, but was an agent of the police. Moreover, defendant was advised initially of her right to counsel when she was first taken into custody at 5 p.m., earlier that evening. One hour later, at 6 p.m., defendant was readvised of her *Miranda* rights before giving her first taped statement to

the police: the deputy sheriff slowly read to defendant her *Miranda* rights, including her right to counsel and her right to appointed counsel should she be unable to afford one. After explaining those rights and before taking her statement, the deputy again asked defendant if she was willing to speak to him without counsel. Defendant agreed to the giving and taping of her statement.

At the beginning of the second taped statement, at approximately 7 p.m., the deputy did not read defendant's *Miranda* rights to her again, but did ask her if she was still "aware" of her rights as explained earlier, and asked if she had any questions concerning the exercise of those rights. Defendant said she had no questions and agreed to the taping of the second statement.

Dr. Kuttner's evaluation of defendant occurred approximately 30 minutes after the conclusion of her second taped statement and after defendant had been fully advised of her *Miranda* rights twice and reminded of them a third time, all within a three-hour period. Dr. Kuttner's warnings to defendant prior to the interview satisfied the three-pronged requirement in *Corbin:* (1) the defendant understood the psychiatrist was employed by the state, (2) the ordinary doctor-patient confidentiality rule did not apply and (3) statements made to the psychiatrist could be used against the defendant. Thus, although defendant was given a slightly truncated version of her full *Miranda* rights prior to the psychiatric interview, we conclude that, under all of the circumstances of this case, the function of the requirements set forth in *Corbin* have been met. Defendant was made fully aware of the adversary nature of the interview with Dr. Kuttner, and it was not error to permit him to express his opinion.[3]

---

[3] Even if Dr. Kuttner had not been permitted to express an opinion based on his interview with defendant, he could have expressed the same opinion based on a review of the two taped statements given by defendant to the police. Presumably, an opinion based on the personal interview was more impressive. Even though the state's principal rebuttal witness relating to defendant's mental condition was a clinical psychologist, who testified on the basis of the results of a battery of tests administered to defendant, it would be difficult to conclude that the admission of Dr. Kuttner's opinion, if error, was harmless. He interviewed defendant shortly after the child's death and, therefore, his testimony might have been more persuasive.

■    Finally defendant, relying on ORS 161.315,[4] challenges the psychiatric examination on the ground that the state has no right to examine a defendant before the affirmative defense of mental disease or defect has been asserted. *State v. Corbin, supra,* decided that question adversely to defendant. The court held that the existence of the statute is no bar to a "consent examination." 15 Or App at 544. Depending upon the circumstances, the state may find it necessary to conduct a psychiatric examination to determine if a defendant is in need of immediate psychiatric assistance.[5] The time of the examination, by itself, is not significant. *See State v. Corbin, supra.*

Affirmed.

---

[4] ORS 161.315 provides:

"Upon filing of notice or the introduction of evidence by the defendant as provided in subsection (3) of ORS 161.309, the state shall have the right to have at least one psychiatrist or licensed psychologist of its selection examine the defendant. The state shall file notice with the court of its intention to have the defendant examined. Upon filing of the notice, the court, in its discretion, may order the defendant committed to a state institution or any other suitable facility for observation and examination as it may designate for a period not to exceed 30 days. If the defendant objects to the examiner chosen by the state, the court for good cause shown may direct the state to select a different examiner."

[5] At trial, Dr. Kuttner testified that the district attorney requested an immediate examination of defendant to determine if she was in need of immediate treatment or might be potentially dangerous to herself in the jail setting and if she could assist in her own defense should criminal charges be brought against her, and also to determine her mental state at that time.