Argued and submitted June 7, affirmed September 27, 1983

# STATE OF OREGON,
*Respondent on review,*

*v.*

# DENNIS LEE MAINS, wtn
# DENNIS LEE MAIN,
*Petitioner on review.*

(TC 74-0191, CA A24630, SC 29361)

669 P2d 1112

Michael E. Swaim, Salem, argued the cause and filed the petition and brief for petitioner on review.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent on review. On the brief were Dave Frohnmayer, Attorney General, William F. Gary, Solicitor General, and Robert E. Barton, Assistant Attorney General, Salem.

JONES, J.

Peterson, C. J., filed a concurring opinion.

Campbell, J., filed a concurring opinion.

## JONES, J.

Defendant was convicted of murder after a jury trial in 1974 and sentenced to life imprisonment. His conviction was affirmed on appeal. He obtained post-conviction relief in April 1982 because of the inadequate assistance of appellate counsel in failing to raise certain issues. The post-conviction court granted defendant a "delayed appeal" on the issues not raised in the initial appeal. *See, Shipman v. Gladden,* 253 Or 192, 453 P2d 921 (1969). The propriety of the delayed appeal is not before this court, because the state did not appeal from the post-conviction judgment.

Defendant argues three issues:

(1) The trial court erred in denying his motion to suppress testimony of a court-ordered psychiatrist because of a failure to advise defendant of his *Miranda*[1] rights before the psychiatrist's examination.

(2) The trial court erred in giving a "weaker and less satisfactory evidence" jury instruction over defendant's objection.

(3) The trial court erred in denying a motion for a mistrial based on rulings made and questions asked of witnesses by the trial judge during the trial.

The Court of Appeals considered these three issues and correctly affirmed the trial court for the reasons which follow.

### NECESSITY FOR WARNINGS

The record indicates that the victim of the murder was a 15-month-old child who died as a consequence of a brain injury inflicted by the defendant. The state charged the defendant with murder under ORS 163.115, claiming defendant "did unlawfully and intentionally cause the death [of the victim] by striking him with his hands." The defendant obtained two pre-trial psychiatric examinations at public expense. He then gave notice of his intention to introduce evidence of extreme mental or emotional disturbance, pursuant to ORS 163.135(2), and of his intention to introduce evidence of the affirmative defense of mental disease or defect, ORS 161.295, pursuant to ORS 161.309(3).

---

[1] *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

The state responded by obtaining an order, ORS 161.315, requiring the defendant to submit to a third psychiatric examination to determine if defendant was not responsible for criminal conduct because of mental disease or defect under ORS 161.295, or partially responsible under ORS 163.115(1)(a). Defendant's attorney, pursuant to the terms of the court's order, was allowed to be present during the examination if desired. *Compare, Shepard v. Bowe,* 250 Or 288, 442 P2d 238 (1968).

The state psychiatrist testified that (1) he told the defendant that defendant's statements could be used in court; (2) the doctor's report might be unfavorable to the defendant; (3) the defendant acknowledged that he understood the statements could be used in court; (4) the defendant was not threatened; and (5) the defendant was offered no inducements to respond to questions.

The state psychiatrist gave expert opinion testimony that at the time of the crime defendant did not suffer from mental disease or defect or from an extreme emotional disturbance, was aware of his acts and was able to conform his conduct to the law at the time the child was killed. Medical testimony established that the victim had numerous bruises, a burn probably caused by a cigarette, four missing front teeth, and other injuries which were not consistent with defendant's explanations. The psychiatrist also testified that defendant admitted during the psychiatric examination that he had become angry with the baby and had thrown him against a chair, injuring the child's head. He acknowledged spanking the victim often and stated that he had struck the child severely on a number of prior occasions, causing various injuries.

The defendant urges this court to adopt the holding in *State v. Corbin,* 15 Or App 536, 516 P2d 1314 (1973), *rev den* (1974), as a basis for suppression of the statements made to the psychiatrist which were admitted at trial. In *Corbin,* the Court of Appeals said:

> "The key reason for requiring that the psychiatrist repeat such a [*Miranda*] warning is to dispel any possibility that the defendant may believe that statements made to the psychiatrist would not or could not be used in court against him. The reasons for this possible misapprehension lie in the vagueness of what is protected by the confidentiality of the doctor-patient relationship. Even more compelling is the need to

dispel any belief that statements made to the psychiatrist would be for the defendant's own good. The defendant must be aware that the psychiatrist is employed by his adversary and is not primarily his healer. * * *" *Id.* at 546.

However, in *State v. Loyer,* 55 Or App 854, 858, 640 P2d 631 (1982), the Court of Appeals distinguished *Corbin* thusly:

"In the case at bar, the circumstances surrounding the state's psychiatric examination were radically different [than *Corbin*]. Here, defendant had counsel, had already been examined by his own expert, Dr. Roberts, and had given formal notice of his intent to rely on a mental disease or defect defense. On the state's motion for its own examination, defense counsel was so informed and presumably could have advised his client as he saw fit. Under these circumstances, the possibility that defendant could have misunderstood the relationship between himself and the examining psychiatrist was absent. Nothing in *Corbin* or subsequent cases indicates that its requirements were intended to apply to such a controlled situation which was actually initiated by defendant with aid of his counsel."[2]

The facts of this case are similar to those in *Loyer.* We take the Court of Appeals' analysis a step further.

The familiar *Miranda* warnings are federal law, devised by the United States Supreme Court to protect an uncounseled person against involuntary self-incrimination when questioned while in custody "or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 US 436, 444, 86 S Ct 1602, 16 L Ed 2d 694 (1966). They inform a person of the right not to answer questions and of the possible adverse use of his answers, and they also advise him of the right to counsel as a means to protect the right against self-incrimination. The details of the *Miranda* warnings are

---

[2] *See, State v. Stein,* 56 Or App 210, 215, 641 P2d 1148, *rev den* 293 Or 373 (1982):

"* * * [T]he interview satisfied the three-pronged requirement in *Corbin:* (1) the defendant understood the psychiatrist was employed by the state, (2) the ordinary doctor-patient confidentiality rule did not apply, and (3) statements made to the psychiatrist could be used against the defendant. Thus, although defendant was given a slightly truncated version of her full *Miranda* rights prior to the psychiatric interview, we conclude that, under all of the circumstances of this case, the function of the requirements set forth in *Corbin* have been met. Defendant was made fully aware of the adversary nature of the interview * * *."

regarded as a judicial means to effectuate the Fifth Amendment's guarantee against compelled self-incrimination. They were addressed to the states as a requirement of due process under the Fourteenth Amendment.

 The Oregon Constitution similarly guarantees the right not to be compelled to testify against oneself in a criminal prosecution. Or Const, Art I, § 12. Like the United States Supreme Court, this court is called upon from time to time to specify the procedure by which a guarantee is to be effectuated. Such specifications are not the same as interpretations of the guarantee itself, that is to say, they may not always and in all settings be the only means toward its effectuation but may be adapted or replaced from time to time by decisions of this court or by legislation in the light of experience or changing circumstances. In the absence of legislation, we believe that the following are the relevant information and warnings required in the setting of a psychiatric examination of a defendant conducted on behalf of the state to guarantee the right not to be compelled to testify against oneself in a criminal prosecution under Article I, Section 12, of the Oregon Constitution.

When a defendant already is represented by counsel, obviously there is no need to explain that the defendant is entitled to counsel. If counsel is present at the examination, a court thereafter may presume that counsel has advised or will advise defendant as to his rights as the occasion may arise.[3] If counsel is not present at the examination, however, the defendant should be asked by the examiner whether he understands that counsel is entitled to be present and has consented to be examined in the absence of counsel. The defendant should further be informed that the examination is conducted on behalf of the prosecution and its results will be available for use against the defendant without the confidentiality of a doctor-patient relationship. *See, State v. Corbin, supra.* Because this defendant was represented by counsel and was advised that the results of the examination could be used adversely during his trial, we find no error in this case.

---

[3] It may nevertheless be a practical precaution at the time of the psychiatric examination to establish that counsel has done so, so as to minimize a possible later issue of effective assistance of counsel.

## THE "WEAKER AND LESS SATISFACTORY EVIDENCE" INSTRUCTION

The trial court gave the following statutory instruction[4] over defendant's objection:

"Evidence is to be estimated by its own intrinsic weight. Evidence is to be weighed not only by its own intrinsic weight but also in [*sic*] the evidence where it is in the power of one side to produce and the other side to contradict. Therefore, if weaker and less satisfactory evidence is offered when it appeared that stronger and more satisfactory evidence was within the power of the parties to produce, the evidence offered should be viewed by you with distrust."

The defendant did not testify. In *State v. Betts,* 235 Or 127, 135, 384 P2d 198, 7 ALR3d 1445 (1963), we said:

"We have repeatedly held that in a criminal case the giving of the [less satisfactory evidence] instruction should be avoided unless limited to the state's case, but so instructing is not reversible error, particularly when the court also instructs, as it did here, that the jury can draw no unfavorable inference from the defendant's failure to testify. *State v. Holleman,* 225 Or 7, 357 P2d 264 [1960]; *State v. Patton,* 208 Or 610, 612, 303 P2d 513 [1956]; *State v. Thomson,* 203 Or 1, 16, 278 P2d 142 [1954]."

In *State v. Greene,* 36 Or App 281, 287, 583 P2d 1171, *rev den* 284 Or 235 (1978), the Court of Appeals found that such an instruction called attention to defendant's failure to testify and was grounds for reversal:

"Defendant did not testify. The Supreme Court has held that the weaker and less satisfactory evidence instruction should rarely, if ever, be given where defendant does not testify in his own defense. [Citations omitted.] This was not one of those rare instances. Furthermore, the court's action was particularly harmful here where the trial court did not give a *curative* instruction to the effect that defendant had no burden of proof. [Citation omitted.]

---

[4] ORS 10.095(7) and (8) provides:

"(7) That evidence is to be estimated, not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; and, therefore,

"(8) That if weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust."

"The instruction unnecessarily called attention to defendant's failure to testify, was therefore error, and requires reversal." (Emphasis added.)

In the instant case, the jury was provided a "curative" instruction, which read:

"The law presumes that the defendant is innocent. This presumption of innocence remains with and follows the defendant throughout the trial of this case and is overcome only when you as trial jurors can say that the state has established the truth of the charge against the defendant beyond a reasonable doubt. The burden of proof is at all times upon the state. The state must prove the truth of each of the material allegations contained in the indictment herein beyond a reasonable doubt. This burden does not shift at any time during the trial but rests upon the state until the close of the case."

The Court of Appeals found that all the instructions taken as a whole did not improperly shift the burden of proof to the defendant:

"* * * There was evidence that defendant's conduct led to the death of the 15-month-old victim. As defendant acknowledges in his brief, '[T]he primary defense in the case was one of extreme emotional disturbance.' The real issues for the jury were the defenses of extreme emotional disturbance (Former ORS 163.125(1)(b); the current version is ORS 163.135(1)), mental disease or defect excluding responsibility (ORS 161.295) and partial responsibility or diminished intent (ORS 161.300). Whether or not the state had the burden of proof as to extreme emotional disturbance or partial responsibility, the court's instructions clearly indicated that the state did have that burden. On the affirmative defense of mental disease or defect excluding responsibility, defendant had the burden of proof by a preponderance of the evidence. ORS 161.055(2); 161.305; *see Leland v. Oregon,* 343 US 790, 72 S Ct 1002, 96 L Ed 1302 (1952); *State v. Dodson,* 25 Or App 859, 551 P2d 484, *rev den* (1976)." (Text of some footnotes parenthetically added.) *State v. Mains,* 61 Or App 422, 427-28, 657 P2d 220 (1983).

This case gives us an opportunity to reiterate in plain and certain terms that the "weaker and less satisfactory evidence" instruction, ORS 10.095(7) and (8), should not be given in criminal cases whether or not the defendant takes the stand, except in those rare instances where because of an asserted defense the defendant has the burden of proof on an issue in

the case.[5] For example, when a defendant elects to attempt to evade responsibility for his conduct because of mental disease or defect, ORS 161.295, the defendant has the burden of proof on that issue. Unless such a defense has been asserted by the defendant the "weaker and less satisfactory evidence" instruction may not be given. We believe such a rule will prevent further confusion about this instruction, provide appropriate guidance to trial courts and avoid unnecessary appeals.

█ In this case the defendant did assert the affirmative defense of mental disease or defect, ORS 161.295, and viewing the instructions as a whole, there was no impermissible shifting of the burden of proof to defendant. *Leland v. Oregon,* 343 US 790, 72 S Ct 1002, 96 L Ed 1302 (1952); *State v. Burrow,* 293 Or 691, 653 P2d 226 (1982); *compare State v. Stockett,* 278 Or 637, 565 P2d 739 (1977). It was not error to give the instruction under the circumstances of this case.

## THE JUDICIAL CONDUCT

The defendant asserts that he was entitled to a mistrial because the trial judge undertook to "cross-exam, and even discredit," the expert witnesses called by the defense.

During the trial, the defense attorney cross-examined the state's psychologist, Dr. McMilan. Defense counsel, Mr. Bevans, was questioning on the distinction between child abuse and other forms of assault. The following dialogue took place in front of the jury:

"[MR. BEVANS:] Well, do you accept as a true proposition that murder of children is instigated during a single direct attack and is an entirely different phenomena of child abuse?

"MR. MEEHAN [prosecutor]: I object, Your Honor. It's a conclusion, unless we're going to use the textbook as an illustration for impeachment purposes.

"THE COURT: Sustained.

---

[5] Of course, it is proper to give the statutory instruction if specifically requested by the defense or to give a modified version such as:

"You are instructed that evidence is to be estimated not only by its own intrinsic weight, but also according to the evidence which it is in the power of the State to produce, and therefore if weaker and less satisfactory evidence is offered by the State when it appears that stronger and more satisfactory evidence was within the power of the State to produce, the evidence offered should be viewed with distrust." Uniform Jury Instruction No. 205.01.

"MR. BEVANS: Your Honor, I would point to the court that we are perfectly prepared to use that book for impeachment purposes, if necessary.

"THE COURT: Well, I don't doubt that, Mr. Bevans, but please tell me what you are impeaching.

"MR. BEVANS: Well, Your Honor, there would be no impeachment except we believe this is certainly a crucial issue. The crime charged is willful murder, and if Doctor McMilan, being familiar with these authorities, agrees with these authorities that murder and child abuse are two separate things, then that certainly goes to the issue of intent and state of mind. If what is determined here to be is child abuse, then obviously that would negate the opposite conclusion of murder if the assumption is accepted by Doctor McMilan.

"MR. MEEHAN: It's my understanding, Your Honor, that when we're talking about textbooks in a medical field, that they are used for impeachment solely for the purpose of discrediting an expert witness, and, to my knowledge, Doctor McMilan has not taken a position concerning intent in this matter.

"MR. BEVANS: Your Honor, to my knowledge he would testify to a matter concerning intent which is a matter which is very critical to this matter.

"THE COURT: Now, wait just a minute.

"MR. BEVANS: Your Honor, I would be willing to rephrase the question if that would assist the Court in making a determination.

"THE COURT: It won't be necessary.

"Well, as I understand the rule to be, extracts from authoritative texts may be read on cross examination for impeachment purposes if the witness recognizes the expertise of the author. Extracts from scientific works may not be received as substantive evidence but may be considered only for the purposes of discrediting an expert witness. All right. What portion of Doctor McMilan's testimony do you propose to discredit?

"MR. BEVANS: Your Honor, I have not yet received the testimony that I intend to discredit. It depends on his answer to my question.

"THE COURT: Well, I don't think you can use the straw man approach, Mr. Bevans, because so far he hasn't said anything. So far he hasn't said anything that you want to impeach, has he?

"Answer me yes or no. What portions of his testimony to date are you trying to impeach?

"MR. BEVANS: Your Honor, he has said nothing at this point that I am trying to impeach.

"THE COURT: Sustained. Objection sustained. There is another thing I want to call to your attention, Mr. Bevans. In the event we get into this field any more, I want to call to your attention that murder has at least 51 definitions in the United States and the District of Columbia. You understand that?

"MR. BEVANS: Yes.

"THE COURT: And we're trying this case under the law of the State of Oregon, not any of the other 50. Do you understand that?

"MR. BEVANS: Certainly, Your Honor.

"THE COURT: All right. Go ahead."

■ No objection was made by anyone and no motion for mistrial was made. This was not plain error. *See* OEC 103(4).[6] In fact, it was not error at all. The ruling on the impeachment issue was correct, the comment to counsel about 51 definitions of murder was unnecessary and irrelevant, but harmless.

Later, in this 24-witness, 10-day trial, which consumed 1,000 pages of transcript, the veteran trial judge did slip. We cannot tell from the record the demeanor of the witness, of counsel or of the trial judge, but it appears that something triggered the judge to a point of exasperation. The court's questioning occurred during cross-examination by the prosecutor of a defense psychologist as follows:

"[PROSECUTOR]: I took it this morning that you were basing most of your opinion upon primarily what [defendant] had told you about his background and so on.

"[PSYCHOLOGIST]: Plus a thousand other things that you learn as a psychologist interviewing people, and after you

---

[6] OEC 103(4) provides:

"Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."

Professor Kirkpatrick comments:

"Rule 103(4) incorporates the plain error doctrine, which in exceptional circumstances allows evidentiary error to be considered as a basis for a new trial or reversal on appeal despite the absence of objection at trial [citations omitted.] * * *" Kirkpatrick, Oregon Evidence 18 (1982).

do it for that long, you get to be so you can be pretty near right in many of the cases. Much —

"THE COURT: Just a minute. Can you elucidate those things for us, sir?

"[PSYCHOLOGIST]: They are very difficult to elucidate because they come from years of practice.

"THE COURT: Would you try?

"[PSYCHOLOGIST]: Let me try.

"THE COURT: There is a thousand?

"[PSYCHOLOGIST]: Right, there's many.

"THE COURT: I'll keep track.

"[PSYCHOLOGIST]: Right.

"Thousand is used not literally to mean —

"[PROSECUTOR]: Doctor, we're being very literal in this case.

"[PSYCHOLOGIST]: Right."

Then the prosecution attempted to commence the examination once again for the purpose of having the psychologist explain what he meant; however, the court continued:

"THE COURT: Now, wait a minute [Mr. Prosecutor]. I want the doctor to answer my question. I want you to give me the thousand —

"[PSYCHOLOGIST]: The thousand ways? There are not a thousand.

"THE COURT: Isn't that your testimony, that there are a thousand other things?

"[PSYCHOLOGIST]: I used that term loosely, Your Honor.

"THE COURT: You realize that you are under oath, don't you?

"[PSYCHOLOGIST]: Yes.

"THE COURT: Would you please not use terms loosely?

"[PSYCHOLOGIST]: Yes Sir.

"THE COURT: Would you be a little more precise, since you are sworn under oath to tell the truth?

"[PSYCHOLOGIST]: I will try very hard to tell the truth.

"THE COURT: And that statement you told me a minute ago was not true?

"[PSYCHOLOGIST]: To say a thousand?

"THE COURT: Yes.

"[PSYCHOLOGIST]: I don't know a thousand.

"THE COURT: Your statement was not the truth?

"[PSYCHOLOGIST]: Not exactly.

"THE COURT: Then would you be precise and truthful?

"[PSYCHOLOGIST]: I will try harder to do that.

"THE COURT: Please do."

The trial judge next examined another defense psychologist who had been asked by the prosecution whether the result would have been different if the tests which were given to this defendant, and to other defendants who are awaiting murder trials, were given to persons who were not facing any such drastic situations:

"[PSYCHOLOGIST]: I would hope not, and I would guess not because when we are trained to give these tests, we are trained to be objective and to interpret the test objectively.

"[PROSECUTOR]: O.K. But the person awaiting the trial isn't, see?

"[PSYCHOLOGIST]: No, that is true.

"THE COURT: Wait. Excuse me. Are you sure you understand the question?

"[PSYCHOLOGIST]: I understand that he asked me would the results be very different between the two groups?

"THE COURT: Did you ever answer it?

"[PSYCHOLOGIST]: And I said I would hope not and guess not.

"THE COURT: Well you don't know?

"[PSYCHOLOGIST]: No, I would say they wouldn't be. That would be my opinion.

"THE COURT: You hope and you guess. Now what?

"[PSYCHOLOGIST]: 'Guess' is a poor choice of words. I would say that it would not be different."

After both sides had completed their examination of this defense witness, the court once again questioned the witness:

"THE COURT: Doctor, you indicated in the first of your testimony you apparently received your PhD, and where was that?

"[PSYCHOLOGIST]: The University of Waterloo.

"THE COURT: Is that Waterloo, Belgium?

"[PSYCHOLOGIST]: Ontario, Ontario, Canada.

"THE COURT: And prior to that, I am assuming that you did some other academic work. Is that the same place?

"[PSYCHOLOGIST]: No, Your Honor. I got my Bachelors Degree at the University of Iowa, and my Masters Degree at Long Island University, and did an internship at Greater Kansas City Mental Health Foundation.

"THE COURT: You have indicated in the course of your testimony that there are definite classifications or keys to the battered child syndrome or the battering parent syndrome. Would you say it happens less frequently with third persons present?

"[PSYCHOLOGIST]: Less frequently than without third persons present.

"THE COURT: And, for example, what would you say about the difference between third persons non-immediate family and third persons immediate family? I'm using third persons in anyone, except the child and the batterer.

"[PSYCHOLOGIST]: Yes.

"* * * * *

"MR. COX [defense attorney]: Your Honor, I would like to object to the question and have a matter I would like to take out of the presence of the jury.

"THE COURT: Your objection is overruled. We'll take up whatever matter you have later. [To the psychologist:] Go ahead.

"[PSYCHOLOGIST]: Stranger versus family, which is your question?

"THE COURT: Yes.

"[PSYCHOLOGIST]: Yeah, the presence of family would give the battering parent more of his emotional supplies than would a stranger. So it might well be that the incidence would be less with family present because of the emotional supplies because the emotional supplies would be available and the anger level less so. On the other hand, it would be possible to invision [sic] the situation where an individual would be conscious and somebody being there who is not a family member, and I think we all tend to have better manners when we're with

strangers than we are with our families. So, both of those situations would provide their own kind of break on the child battering.

"THE COURT: Would it be pretty hard, do you think, to draw any general conclusions in the area or would they pretty much neutralize, do you think?

"[PSYCHOLOGIST]: I think they might be hard to weigh. Each has its own inhibiting factor.

"THE COURT: O.K. As I understand, doctor, it would happen more often if no third party were present?

"[PSYCHOLOGIST]: Yes, that is the most dangerous situation."

During recess, following a heated exchange between the court and defense counsel, defense counsel made an objection and motion:

"THE COURT: You have a matter you want to take up. We'll take it up at this time.

"MR. COX [defense attorney]: Your Honor, the defense would like to and would, in fact, object to the Court's putting himself into the case as much as he has in questioning of the witnesses, in general, and, specifically, the witnesses for the defense. Our objection goes not only to the type of questioning but also to the suggestions and insinuations as we interpret them that the Court has made while questioning the witnesses.

"* * * * *

"MR. COX: At this time we would request the Court to instruct the jury at the beginning of the case after 1:30 p.m. the instruction indicating that the court has no intent to influence the jury, no desire to do so, and that they should not interpret any activities by the Judge as having reached a certain conclusion.

"THE COURT: Your request is denied. I shall do so, instruct them, at the conclusion of the case, if someone requests an appropriate instruction, Mr. Cox. * * *"

The court then took a recess for lunch after which the following occurred, though still outside the presence of the jury:

"THE COURT: Do you have something, Mr. Cox?

"MR. COX: Yes, Your Honor. May it please the Court, with all due respect, I would at this time move the Court for a

mistrial on the grounds of the denial of the court of our previous motion and the grounds stated thereunder.

"THE COURT: Your motion is denied, Mr. Cox. * * *"

It must be noted that defense counsel did not move for a mistrial because of the court's comments, but because of the court's failure to give a "curative" instruction at that time. This motion was made near the end of the trial. At the conclusion of the trial, the court gave the "curative" instruction previously requested:

"* * * Let nothing the Court has said in the course of the trial and in the course of these instructions lead you to believe that the Court has or intends to convey any opinion to you as to the facts or as to the credibility of any witness, for the Court has no right to influence you in any manner in your determination of these matters nor does it have any desire to do so. * * *"

Therefore, the defendant received, albeit belatedly, exactly what he requested. Nevertheless, we find it was plain error (currently covered under OEC 103(4), *supra* n 6) for the seasoned trial judge to ask most of the quoted questions of the witnesses or make many of the quoted comments before the jury. The innocuous reference by the psychologist to "a thousand" things was obviously a figure of speech, which did not require examination by the court for the purpose of making any evidentiary ruling. The subsequent questions tended to not only embarrass the witness but to attack the credibility of the psychologist, especially the reference "[y]ou realize that you are under oath, don't you?"

This experienced trial judge simply had a bad day. His questions and comments did reflect his contempt for the witness's testimony and went beyond the bounds of proper judicial control of the trial. A judge who engages in an examination of a witness from the bench through this type of questioning and comment may well convey to the jury the judge's evaluation of the testimony.

An Oregon jury trial is an adversary proceeding based on the rationale that the opposing parties, motivated by self-interest, will assure a full and thorough presentation of the issues and relevant evidence. A basic requirement for a fair trial is that it be supervised by a fair and impartial judge. Fairness requires not only an absence of actual judicial bias in the trial of a case, but the absence of even the appearance of bias.

In achieving this goal the trial judge must not take on the role of counsel, nor appear to align himself with any litigant. Of course, the judge has a higher duty to the law than to just sit back silently and tolerate improper conduct by lawyers or witnesses simply because no one objects.

■　　　Certainly, it is appropriate for a judge to run a "tight ship" to reduce verbal conflicts between counsel, to eliminate "speaking" objections, to expedite jury selection, to eliminate argument in opening statements, to control questioning of witnesses to prevent abuse or harassment, to restrict closing arguments to legal limits and, when necessary, to admonish counsel for unacceptable conduct. These are only a few examples of many approved actions a trial judge may undertake to conduct a proper, expeditious and just trial. The judge has explicit[7] and inherent power to control the trial of the case.

■　　　Obviously, the trial judge has a duty to be more than a passive referee if the adversary system breaks down to a level where the jury is not receiving a fair presentation of the facts. There is no doubt that a trial judge may question witnesses in criminal jury trials:

"Under the Anglo-American adversary trial system, the parties and their counsel have the primary responsibility for finding, selecting, and presenting the evidence. However, our system of party-investigation and party-presentation has some limitations. It is a means to the end of disclosing truth and administering justice; and for reaching this end the judge may exercise various powers.

"Prominent among these powers is his power to call and question witnesses.

"The judge in his discretion may examine any witness to bring out needed facts which have not been elicited by the parties. * * *" (Footnotes omitted.) McCormick, Evidence 12, § 8 (2nd ed 1972).

---

[7] ORS 1.010(5) provides:

"Every court of justice has power:

"* * * * *

"(5) To control, in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter appertaining thereto."

■ At common law the trial judge was an active participant in the trial, calling and questioning witnesses, analyzing evidence, and guiding the jury by commenting on the evidence and the credibility of witnesses. 3 Wigmore, Evidence § 784 (Chad rev 1979). Federal trial judges still have those same powers, but the jurors remain the ultimate fact-finders with any comment by the trial judge not to be interpreted as binding upon them. *Quercia v. United States,* 289 US 466, 469-71, 53 S Ct 698, 77 L Ed 1321 (1933).

■ In direct contrast to the federal system, this state is a strong "no comment" state. ORCP 59E;[8] *see* ORS 136.330(1). Although Oregon law does not allow a trial judge to "comment" on the evidence, judicial examination of witnesses is allowed to elicit the truth and clarify the facts for the jury. Indeed, there are occasions when the trial judge's failure to examine a witness may result in a grave injustice. Most questions of a witness by the court should be asked outside the presence of the jury, such as when necessary to properly rule on an offer of proof under OEC 103(2) or deciding preliminary questions on admissibility of evidence under OEC 104.

Difficult questions arise when, for example, an inexperienced prosecutor proves every element of a crime beyond a reasonable doubt but forgets to prove venue which is not subject to dispute. What is the responsibility of the trial judge? To speak or not to speak? To allow an obvious injustice to the state to occur or to act the role of a prosecutor? Conversely, what if an inexperienced defense lawyer fails to object to damaging hearsay testimony offered against the defendant? Is the judge to assume counsel's role and *sua sponte* exclude the evidence, or merely have faith that expensive post-conviction proceedings will bring some ultimate legal relief (usually after a sentence has been imposed)? These and many other problems regularly confront and perplex trial judges. The answers are not easy. With forethought and wisdom that great legal scholar, Roscoe Pound, commented critically that, unfortunately, "the inquiry is not, what do substantive law and justice

---

[8] ORCP 59E provides:

"**Comments on evidence.** The judge shall not instruct with respect to matters of fact, nor comment thereon."

658

require? Instead, the inquiry is have the rules of the *game* been carried out strictly?"[9] (Emphasis added.)

■ We do not perceive a trial to be a *game,* particularly trials of the intense severity as in this present case. The modern jury trial is one of the most important, demanding, exhausting, probing, and sometimes humbling and humiliating events that can be experienced by a person, be that person a party, a witness, a lawyer or a judge. It is not a sporting event and the judge is no mere referee. It is not a debate and the judge is not a moderator. The judge is not a litigant, nor a witness, and above all, not an advocate for either side. Therefore, we believe that judicial intervention before a jury should be kept within bounds, and the judicial questioning of witnesses or admonition of counsel in the presence of a jury should be a rare occurrence. Almost any question the judge may pose is fraught with the danger of giving the impression to the jury that the judge is an advocate for one of the parties. There is no question that juries are highly sensitive to the trial judge's words and even to non-verbal communications.[10]

Federal Evidence Rule 614 specifically provides for the right of a federal trial judge to call and interrogate witnesses:

## "CALLING AND INTERROGATION OF WITNESSES BY COURT

"(a) **Calling by court.** The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.

"(b) **Interrogation by court.** The court may interrogate witnesses, whether called by itself or by a party.

"(c) **Objections.** Objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present."

However, the trial lawyers serving on the Oregon Evidence Revision Commission did not wish to memorialize this inherent power of all judges with an evidence rule.[11] These

---

[9] Pound, *The Causes of Popular Dissatisfaction with the Administration of Justice,* 40 Am L Rev 729 (1906).

[10] *See* 49 ALR3d 1186 and 84 ALR 1172.

[11]
"Although concluding that Federal Rule 614 was consistent with current Oregon law relating to the calling and interrogation of witnesses by the court, the

commission members, who had vast experience in federal and state trials, wanted no interference by the trial judge in the adversary process. They strongly believed that active participation by a trial judge in calling or questioning witnesses inevitably placed yet another opponent in the trial arena. Further, they contended that jurors are so profoundly influenced by the trial judge that the essence of a fair jury trial is threatened or defeated by judicial intervention. Therefore, the Oregon Evidence Revision Commission rejected FRE 614 for Oregon trials and the legislature followed its recommendation for deletion.

The legislature, in enacting ORCP 59E and ORS 136.330(1), and in implicitly adopting the sentiments of the promulgators of the new evidence code by not enacting FRE 614, echoed what we have already stated. Excessive intervention by a trial judge substantially diminishes the effectiveness of the adversary system and may deprive a litigant of his right to an impartially administered trial.

Some 70 years ago in the memorable case of *Edwards v. Mt. Hood Const. Co.,* 64 Or 308, 130 P 49 (1913), Justice McBride wrote what is still applicable for today's trial judges. Judge Henry E. McGinn, the trial judge, engaged in the following colloquy with counsel during a heated circuit court trial:

" 'Q. And did you have a contract with that lady to board these men?

"The Court: 'It is immaterial whether he did or not—I cannot see how it is material in this case whether he had such a contract with her or not.'

"Mr. Banks: 'We will save an exception to the ruling of the court.'

"The Court: 'You may have an exception.'

"Mr. Banks: 'And I also save an exception to the court acting as counsel for the plaintiff in this case.'

"The Court: 'Very well, you may have your exception.'

---

Advisory Committee was reluctant to provide the court with an expanded role in the examination or cross-examination of witnesses. By not adopting Federal Rule 614, the members of the Advisory Committee do not intend to deny or limit the inherent power of a trial court to call and interrogate witnesses." Proposed Oregon Evidence Code, Report of the Legislative Interim Committee on the Judiciary, 138 (December, 1980).

"Mr. Banks: 'Also, save an exception to the court's actions in favor of the plaintiff in this case as indicated by the court's demeanor upon the bench.'

"The Court: 'You may take your exception.'

"Mr. Banks: 'And I also save an exception to the court acting in favor of the plaintiff in this case by its mental attitude, and its rulings and its attitude upon the bench, something which this defendant cannot get upon the record, but which is prejudicial to its rights, and before the court has even heard the testimony on behalf of the defendant; and I desire to further except and object, as strongly as I can possibly do so, and insist that it is not the business of the court to undertake to influence the jury by its attitude upon the bench in the trial of this cause, and I will say right here, and without any intention of offering an insult to your honor, and realizing that I am an attorney in the case, but necessarily am here to protect the rights of my own client, that I must protest against the attitude of the court in this case, and I wish the record to show that I am here, and do protest against the attitude of the court, the facial expression of the court in its rulings, the demeanor of the court as shown by its actions upon the bench during the taking of this testimony on behalf of the plaintiff in this case.'

"The Court: 'You may have an exception to every bit of it, and you can get a photographer to take the facial expression of the court, and a phonograph of the voice of the court.'

"Mr. Banks: 'And, if the court is willing, I am willing to put into the record that the court has stated to me, outside the trial of this case, that he did not propose to see the plaintiff in this action defeated, and that that statement was made before the testimony of the defendant had been presented. Does the court want that in the record?'

"The Court: 'Put everything in the record. I tell you now that this infamous case will not be decided against this woman.'

"Mr. Banks (to stenographer): 'Just take that down, "I tell you now that this infamous case will not be decided against this woman," just put that into the record.'

"The Court: 'Yes, put that into the record—against this woman it will not be.'

"Mr. Banks: 'And we take an exception to that remark, to the remark of the court just made. Will an exception be allowed, your honor?'

"The Court: 'Certainly, certainly.' " *Id.* at 311-13.

Justice McBride, writing for this court wrote:

> "It was error for the court to express its opinion of the evidence in the presence of the jury. The duty of a judge is to see that both sides of a case have a fair hearing, and that the jury renders an impartial verdict, without any suggestion or comment from the court as to what verdict ought to be rendered. To say to an attorney in the hearing of the jury that his case is 'infamous,' and that his client shall never have a judgment, and especially before the client has had an opportunity to present his side of the case, is language that should never be used in a court of justice. Upon the case presented by the plaintiff there was certainly some ground for the supposition that defendant had dealt unfairly with the plaintiff, but the defendant's story had not been heard, and, when heard, might have given the case an entirely different aspect. The writer knows from experience on the circuit bench that it is sometimes very difficult for a judge to refrain from making comments on a case during the progress of the trial, and especially where an apparent injustice seems to have been perpetrated; but after a reversal or two, occasioned by this practice, he concluded to go, not to the ant, but to the meek and lowly oyster, to 'consider its ways and be wise,' and to keep the judicial mouth shut. He commends the example of the silent oyster to all trial judges."[12] *Id.* at 314-15.

We believe Justice McBride's admonition is still a good basic rule of thumb for trial judges, although we have set forth many examples where judicial intervention is appropriate. *See, State v. Bouse,* 199 Or 676, 705, 264 P2d 800 (1953), *overruled on other grounds State v. Fischer,* 232 Or 558, 565,

---

[12] The decision did not dissuade the ribald Judge McGinn from candor about the merits of a case in front of the jury. Two years later, in *Frederick & Nelson v. Bard,* 74 Or 457, 458-59, 145 P 669 (1915), he said to a jury:

> " 'The Court: Gentlemen, that verdict cannot stand. I am not going to allow this verdict to stand; this man here wrote letters time and time again in which he admitted he owed these notes; now, he is a lawyer, and he knew perfectly well what he was doing, and if anybody thinks I am going to allow those people over there to be robbed in this manner, they will get fooled. This man lives in Portland here, and strong influences have been brought to bear here, and it don't make any difference; this verdict will not stand. This man owes that money, and every man on this jury knows it. Gentlemen, you will be discharged from further consideration of this case. There will be a new trial granted. It takes 13 men to rob anybody in this court, and I want that understood. That man owes that money, and he will pay it if I have anything to say about it.' "

376 P2d 418 (1962); Linde, *Criminal Law—1959 Oregon Survey,* 39 Or L Rev 161, 174 (1959).

■ Returning to this present case, except for the lapses quoted, the trial judge conducted the rest of this very difficult child homicide case with complete impartiality and judicial skill. Although we condemn the judge's questions and comments to the defense experts, the interrogation was on peripheral issues and constituted harmless error.

## HARMLESS ERROR

In *State v. McLean,* 255 Or 464, 468 P2d 521 (1970), we discussed the concept of harmless error under Article VII (Amended), Section 3, of the Oregon Constitution, which provides:

"* * * If the supreme court shall be of the opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial * * *. Provided, that nothing in this section shall be construed to authorize the supreme court to find the defendant in a criminal case guilty of an offense for which a greater penalty is provided than that of which the accused was convicted in the lower court."

In *McLean* we were also guided by ORS 138.230, which provides:

"After hearing the appeal, the court shall give judgment, without regard to the decision of questions which were in the discretion of the court below or to technical errors, defects or exceptions which do not affect the substantial rights of the parties."

Our decision in *McLean* was:

"We hold, however, in accordance with the terms and purposes of that statute and the constitutional provision, that in a case in which, despite some conflict in the testimony, there is substantial and convincing evidence of guilt and error, if any, was either so technical in nature or so unsubstantial that this court can affirmatively find, as a practical matter, that there was 'little, if any, likelihood of having changed the result of the trial,' this court may then, in its discretion, exercise its power

to affirm the verdict and judgment of the trial court, notwithstanding the existence of such error." (Footnote omitted.) *Id.* at 478-79.

In *State v. Van Hooser,* 266 Or 19, 511 P2d 359 (1973), we retreated from any reliance on ORS 138.230 because in our view the language of the constitutional amendment is broader "and because of its constitutional status is controlling." *Id.* at 23. "The standard fixed in the amendment should be the sole criterion for determining whether the judgment should be affirmed." *Id.* at 23. In *Van Hooser* we found that the constitutional requirements for affirmance despite error are: "(1) that there was substantial and convincing evidence of guilt;[13] and (2) that the error committed was very unlikely to have changed the result of the trial."[14] *Id.* at 25-26.

In *State v. Harley,* 218 Or 263, 267, 344 P2d 773 (1959), we recognized that the authority or duty given to this court under Article VII (Amended), Section 3, "has been and should be exercised with utmost caution."[15]

Previously we said in *State v. Wederski,* 230 Or 57, 62, 368 P2d 393 (1962), that when a defendant claims that he has not received a fair trial, Article VII, Section 3, may require different considerations:

"If the only way defendants can be assured fair trials is for appellate courts to reverse an occasional judgment in the face

[13]In *State v. Naylor,* 291 Or 191, 196-97 n 3, 629 P2d 1308 (1981), we noted:

"We did not explain what we met by 'substantial and convincing evidence.' Ordinarily, when we use the term 'substantial evidence,' we do not equate it with that quantum and quality of evidence necessary to establish proof beyond a reasonable doubt. When we use the adjective 'convincing,' to modify the noun 'evidence,' we normally couple it with another adjective, i.e., 'clear and convincing.' We certainly regard 'clear and convincing evidence' as being something less in quantum and quality than that necessary for conviction in a criminal case."

[14] While in *McLean* we were of the opinion that these were a composite of the requirements of both the amendment and the statute, in *Van Hooser* we found that they are reasonable criteria to use in complying with the constitutional mandate.

[15] We explained in *State v. Naylor, supra* n 12:

"The result in *State v. Harley,* 218 Or 263, 344 P2d 773 (1959), was expressly approved in *State v. McLean,* 255 Or 464, 468 P2d 521 (1970), although a further rule followed in *Harley* was disapproved in *McLean.* The rule overruled was that the judgment must be reversed unless the record conclusively shows that the error was not prejudicial. By citing *Harley* in the text of this opinion, we do not mean to resurrect that rule." 291 Or at 197 n 4.

of what well may be overwhelming evidence of guilt, then that is the course we must take. * * *"

In *State v. Folkes,* 174 Or 568, 619, 150 P2d 17, *cert den* 323 US 779 (1944), we stated:

"* * * If we were of the opinion, on examination of the entire record, that the defendant did not have a fair trial before the jury, an entirely different question as to the applicability of Art. VII, § 3, would be presented."

Although we have indicated that we do not approve of the trial judge's comments and conduct in this trial, the question we must resolve is whether any "error committed was very unlikely to have changed the result of the trial." *State v. Van Hooser,* 266 Or at 25-26; *State v. Davis,* 70 Or 93, 140 P 448 (1914).

The harmless error rule which may be applied when federal constitutional error has been committed, is not to be confused with either the federal harmless error rule that is applied in federal courts when non-constitutional error occurs, *see Kotteakos v. United States,* 328 US 750, 66 S Ct 1239, 90 L Ed 1557 (1946), or with our own harmless error rule applicable to errors of state law. Or Const, Art VII (Amended), § 3.

Our judgment must be based on our reading of the record and on what seems to us to have been the probable impact of the judge's conduct on the minds of the jurors.

In *State v. Merlo,* 92 Or 678, 689, 173 P 317 (1918), *aff'd on rehearing* 182 P 153 (1919), we said:

"* * * There can be no question but that the amendment of Article VII of the Constitution in 1910 changed, or at least accentuated the law as it stood before in regard to prejudicial errors, in favor of an affirmance of a judgment, unless actual prejudicial error appears."

We reaffirmed the same general concept in *State v. Cahill,* 208 Or 538, 582, 293 P2d 169, *aff'd on rehearing* 298 P2d 214, *cert den* 352 US 895 (1956), *overruled on other grounds State v. Hanna,* 224 Or 588, 592, 356 P2d 1046 (1960). Although we decide the meaning of "harmless error" under Oregon's constitution, we observe that in *Chapman v. California,* 386 US 18, 22, 87 S Ct 824, 17 L Ed 2d 705 (1967), the United States Supreme Court announced that even a federal constitutional violation could be harmless error:

"* * * We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction."

*Chapman* continued a trend away from the practice of appellate courts in this country and in England of "reversing judgments for the most trivial errors." Traynor, The Riddle of Harmless Error 13 (1970).

Applying the approach mandated by Article VII (Amended), Section 3, of the Oregon Constitution, we conclude "that the error committed was very unlikely to have changed the result of the trial," *State v. Van Hooser,* 266 Or at 25,[16] and was therefore harmless.

The Court of Appeals is affirmed.

**PETERSON, C. J.,** concurring.

I concur in the result, but disassociate myself from this statement, which appears at page 645 of the opinion:

"* * * If counsel is not present at the examination, however, the defendant should be asked by the examiner whether he understands that counsel is entitled to be present and has consented to be examined in the absence of counsel. * * *"

This court never has held that a defendant is entitled to the presence of counsel at such an examination. The issue is not directly presented in this case, and I would not decide it. *Compare State ex rel Russell v. Jones,* 293 Or 312, 333, 647 P2d 904 (1982) (dissenting opinion).

**CAMPBELL, J.,** concurring.

I concur in the result.

---

[16] *Compare, State v. Naylor, supra* n 12.