No. 51 December 3, 2015 325

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ISACC CREED AGEE,
*Defendant-Appellant.*

(CC 09C41224; SC S059530)

En Banc

On automatic and direct review of the judgment of conviction and sentence of death imposed by Marion County Circuit Court.

Pamela L. Abernethy, Judge.

Argued and submitted on April 22, 2015.

Ryan T. O'Connor, O'Connor Weber LLP, Portland, argued the cause and filed the briefs for petitioner. With him on the briefs was Kenneth A. Kreuscher.

Timothy A. Sylwester, Attorney General, Salem, argued the cause and filed the brief for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Susan G. Howe and Michael S. Shin, Assistant Attorneys General.

BALMER, C. J.

The judgment of conviction is affirmed. The sentence of death is vacated, and the case is remanded to the circuit court for further proceedings.

**BALMER, C. J.**

This case is before us on automatic and direct review of defendant's judgment of conviction and sentence of death for aggravated murder. ORS 138.012(1). For the reasons that follow, we affirm the judgment of conviction, vacate the sentence of death, and remand this case to the circuit court for further proceedings.

## I.  BACKGROUND

We begin with an overview of relevant facts; we describe additional facts in our discussion of defendant's assignments of error. Because the jury found defendant guilty, we view the evidence presented at trial in the light most favorable to the state. *State v. Washington*, 355 Or 612, 614, 330 P3d 596 (2014).

In May 2005, defendant arrived at the Oregon State Penitentiary to begin serving a 40-year sentence for attempted murder and other offenses. In February 2008, defendant and his cell-mate, Davenport, entered the cell of a third inmate, the victim, when the doors to all the cells in the area were opened to permit the inmates to go to breakfast. Both defendant and Davenport were wearing gloves and were armed. Defendant had a seven-inch-long shank with a half-inch piece of sharpened metal on the end, sheathed in the plastic casing of a highlighter pen. Davenport was carrying a mesh laundry bag containing an almost four-pound piece of concrete wrapped in a stocking cap. The door to the cell closed after about 30 seconds, locking defendant and Davenport in the cell with the victim. Davenport began striking the victim in the head with the concrete block. Defendant stabbed the victim in the legs and torso 28 times with the shank.

A corrections officer heard panting and investigated. He saw two inmates standing in the cell, out of breath, and another on the ground; he yelled to another corrections officer for help. The two corrections officers saw Davenport standing in the back of the cell near the victim's head and defendant standing to the side of the cell, near the victim's torso and legs and next to a table in the cell. While the officers waited for other guards to arrive (to enable them safely to open the cell door), they saw Davenport strike the victim in the head about 20 times with the concrete block, and saw

defendant kick the victim in the ribs and punch him in the chest with a closed fist. Defendant walked to the cell door and submitted to wrist restraints as Davenport continued to strike the victim's head with the concrete block. Davenport also eventually submitted to restraints. Officers removed Davenport and defendant from the cell and a nurse confirmed that the victim was dead. While defendant was being escorted from the scene, a corrections officer asked him whether he was in possession of any weapons. Defendant responded no, he had left his weapon on the table in the cell. The shank was later found on the table. According to the state medical examiner, the victim died from the blows to the head with the concrete block. The shank caused only superficial wounds.

Defendant and Davenport were jointly charged with aggravated murder for the intentional homicide of a prison inmate by another inmate. ORS 163.095(2)(b) (defining aggravated murder as murder committed when defendant was confined in a correctional facility at time that murder occurred). The state declared its intention to seek the death penalty for both defendants. After Davenport provided the state with evidence of his mental incapacity dating back to his early teen years, the state conceded that Davenport was "mentally retarded"[1] and therefore ineligible for the death penalty under the controlling United States Supreme Court case, *Atkins v. Virginia*, 536 US 304, 321, 122 S Ct 2242, 153 L Ed 2d 335 (2002) (holding that execution of "mentally retarded" persons violates Eighth Amendment's ban on cruel and unusual punishment). Davenport subsequently pleaded guilty and was sentenced to life in prison without the possibility of parole.

Defendant also moved the trial court to declare him intellectually disabled and ineligible for the death penalty, but the state did not concede the issue as to him. Because, as we discuss in more detail below, there are no specific

_____

[1]  At the time of defendant's trial, the terms "mental retardation" and "mentally retarded" were in common usage in court opinions and in the medical literature. The mental health community now agrees that the preferred clinical terms are "intellectual disability" and "intellectually disabled." Throughout the remainder of this opinion, therefore, we use those terms unless we are directly referring to a source that uses one of the now-disfavored terms.

procedural or substantive guidelines in Oregon for determining when a defendant is ineligible for the death penalty under the general holdings of *Atkins*, the trial court determined that it would conduct a pretrial hearing at which defendant would have the burden of proving that he is intellectually disabled by a preponderance of the evidence. Defendant acceded to that procedure.[2]

In an April 2011 hearing, both the state and defendant offered evidence from psychologists and psychiatrists concerning defendant's mental health and intellectual abilities. The trial court found that defendant suffered from partial fetal alcohol syndrome but concluded that defendant had not established an intellectual disability that would make him constitutionally ineligible for the death penalty. In May 2011, a jury was empanelled and, after a guilt-phase trial, the jury found defendant guilty of aggravated murder. At the conclusion of a further, penalty-phase proceeding under ORS 163.150, the jury determined that defendant had acted deliberately in committing the murders, that he posed a continuing risk to society, and that he should receive a death sentence. ORS 163.150(1)(b)(A), (B), (D). The trial judge then entered a sentence of death. This automatic and direct review followed.

## II.   ASSIGNMENTS OF ERROR

On review before this court, defendant raises 29 assignments of error. We have reviewed all those assignments of error and conclude that many of them are not well taken and do not merit further discussion.[3] We address defendant's remaining assignments of error below.

---

[2] In fact, defendant suggested that procedure in a brief to the trial court outlining the various ways that other states have handled similar situations.

[3] With respect to several of the assignments of error that we do not address—those relating to (1) the trial court's admission, during the guilt phase, of an audio recording of a telephone conversation between defendant's mother and his incarcerated brother; (2) the trial court's admission, during the guilt phase, of two pieces of paper found after the murder in defendant's prison cell among defendant's other property; and (3) the trial court's imposition of a death sentence notwithstanding defendant's argument that the jury was not given proper accomplice liability instructions—we conclude either that the error was not preserved or that the trial court did not err. The others have been answered adversely to defendant's position in prior decisions by this court, and, therefore, further discussion will not benefit the public, the bench, or the bar.

We discuss five assignments of error. Only one assignment of error concerns a ruling made during the guilt phase; we begin there.

A. *The Trial Court's Decision to Permit Extensive Cross-Examination of Codefendant Outside Presence of Jury*

At defendant's trial, after the completion of jury selection but prior to the jury being sworn, the trial court and both parties called to the stand eight inmates for the limited purpose of inquiring whether the inmates intended to invoke their privileges against self-incrimination if called as witnesses in front of the jury. One of those witnesses was Davenport. The trial court swore in Davenport and defendant conducted a limited examination about whether Davenport was willing to testify about the events on the day that the victim was killed and Davenport's involvement with a particular prison gang.[4] Defense counsel asked and received answers to the following questions: whether Davenport understood that he would be asked about the events surrounding the murder and his involvement with the gang, whether Davenport would testify about those things, and whether he would invoke his Fifth Amendment privileges.

On cross-examination, after confirming that Davenport would testify about the events of the day of the murder, the prosecutor asked whether Davenport was prepared to testify about what happened during the week before the murder. Davenport initially responded that nothing had happened the week before. The prosecutor then asked Davenport if he was a "gangster." Davenport replied that he would not answer that question, but would testify about his involvement in the murder and exactly what happened that day. The prosecutor told Davenport that he was required to answer any question that was put to him and again asked whether Davenport was a gangster. Davenport

_____

[4] Part of the defense theory was that Davenport was a member of a prison gang and wanted to kill the victim because the gang leadership had directed that the victim be killed. Defendant's theory was that he went along with Davenport because he was Davenport's childhood friend and a "follower," even though he was not a member of the gang. Davenport's testimony supported that theory: Davenport maintained that he alone was the mastermind and executor of the murder and that defendant was merely a spectator whom Davenport had goaded into accompanying him into the victim's cell.

continued to refuse to answer that question, and defense counsel began to object. The prosecutor interrupted the defense objection to complain to the judge that, if Davenport were not willing to answer the prosecutor's questions, he should not be allowed to testify at the trial at all. The court then conducted a colloquy with Davenport in which Davenport agreed to answer questions from both parties if he were called as a witness. The court directed the prosecutor to ask again about Davenport's gang involvement, to "test" Davenport's willingness to cooperate. The prosecutor posed multiple questions about Davenport's gang membership, his gang tattoos, his relationship with various gang members, his knowledge of the gang's power structure, and the role of the gang in the murder. During that questioning, Davenport at first attempted to avoid giving direct, truthful answers, even though the court reminded him several times that this was a "test run" to determine if he would cooperate with cross-examination. Davenport eventually began to answer the prosecutor's questions, although he frequently answered, "I don't know." From there, the prosecutor moved on to questions about Davenport's relationship with defendant, which Davenport answered directly.

The prosecutor then began asking Davenport specific and detailed questions about his and defendant's actions on the day of the murder:

"[PROSECUTOR]:   And on the 14th, you keep saying that you're the one that did the killing.

"[DAVENPORT]:   Yes, I did.

"[PROSECTUTOR]:   What weapons did you use?

"[DAVENPORT]:   I used a knife and a chunk of cement.

"[PROSECUTOR]:   Okay. Where was the defendant?"

Defendant objected for a second time, arguing that Davenport had made clear that he would answer questions about the day of the murder. The trial court overruled the objection and allowed the prosecutor to continue examining Davenport. The prosecutor resumed asking Davenport questions about his and defendant's actions during the murder, including asking leading questions to draw out a moment-by-moment description of defendant's and Davenport's

actions and statements leading up to and during the assault on the victim, and including eliciting testimony about how Davenport coerced defendant into entering the victim's cell.

Defense counsel raised a third objection, noting that the purpose of the hearing was limited to an inquiry about whether the inmate witnesses would be invoking their Fifth Amendment right not to testify. Defendant conceded that the prosecutor had had reason to ensure that Davenport would testify about his gang involvement and who ordered the murder, but he argued that this was not an opportunity for a pretrial deposition about the murder; Davenport had no arguable Fifth Amendment right not to testify about the murder itself and, therefore, the prosecutor should not be allowed effectively to depose him on that topic at that hearing. The prosecutor responded that "[t]his is not about him taking the Fifth." Rather, the prosecutor argued, the issue was whether Davenport would answer the state's questions. The prosecutor argued that he should be permitted to determine whether Davenport would "talk through the incident in its entirety," and, if not, then his testimony should not be allowed. The trial court overruled defendant's objection and directed the prosecutor to continue, which he did, in the same vein as earlier, questioning Davenport in detail about his and defendant's roles in the murder, his and defendant's statements during the murder, and what information defendant would have known prior to the murder.

Defendant argues in this court that, generally, trial courts do not have authority to compel a criminal witness to be deposed or give pretrial testimony outside the presence of the jury. *See State ex rel O'Leary v. Lowe*, 307 Or 395, 401-02, 769 P2d 188 (1989) (issuing writ of mandamus directing trial court to withdraw order requiring prosecutor to produce some of state's criminal witnesses for pretrial deposition by defendant, holding that "[t]here is no statutory right in Oregon for a criminal defendant to depose a potential state's witness"). Although *O'Leary* involved a defendant's effort to compel pretrial testimony from a state witness, defendant argues that the same rule would apply to the prosecution. Defendant acknowledges the trial court's authority to permit examination of a witness outside the presence of the jury for purposes of trial management, but

he argues that, under *O'Leary*, trial courts have no authority to compel a defendant or a witness in a criminal trial to submit to pretrial depositions. Defendant contends that the holding in *O'Leary* is consistent with ORS 136.420, which precludes (with two exceptions not relevant here) any form of "testimony," including depositions, in a criminal case, other than oral testimony in the presence of the court and jury.[5] Defendant argues that the pretrial examination and deposition of Davenport allowed the prosecution to conduct essentially full discovery of Davenport, under oath and outside the presence of the jury, and that it is hard to overstate the utility of that sort of prior opportunity to question a central defense witness.

Trial courts have explicit and inherent authority to control courtroom proceedings. *See State v. Mains*, 295 Or 640, 656, 669 P2d 1112 (1983) (so stating); ORS 1.010 (every court has power to regulate proceedings before it and to control, in furtherance of justice, conduct of persons connected with judicial proceedings); OEC 611(1) (court shall exercise reasonable control over presentation of evidence); *see also* ORS 135.037(3) (providing for omnibus pretrial hearings where trial court "may also consider any matters that will facilitate trial by avoiding unnecessary proof or by simplifying the issues to be tried, or that are otherwise appropriate under the circumstances to facilitate disposition of the proceeding"). Moreover, a trial court has broad discretion when exercising its authority to control the presentation of evidence.[6] *State v. Cox*, 337 Or 477, 495, 98 P3d 1103 (2004) (trial court had authority to strike from record entirety of

---

[5] ORS 136.420 provides:

"In a criminal action, the testimony of a witness shall be given orally in the presence of the court and jury, except:

"(1) In the case of a witness whose testimony is taken by deposition by order of the court in pursuance of the consent of the parties, as provided in ORS 136.080 to 136.100 [providing that trial court may require, as precondition for granting postponement of trial, requesting party's consent to depositions of its witnesses]; or

"(2) As provided in ORS 131.045 [permitting court appearances by simultaneous electronic transmission]."

[6] Exercising control over the presentation of evidence helps to reduce verbal conflicts between counsel, to eliminate "speaking" objections, to prevent abuse or harassment of witnesses during questioning, to restrict closing arguments to legal limits, and to avert error. *Mains*, 295 Or at 656.

defendant's trial testimony after he refused to answer three questions posed to him by the state on cross-examination); *see also State v. Rogers*, 330 Or 282, 302, 4 P3d 1261 (2000) (*Rogers I*) (trial court has authority to pre-approve contents of aggravated murder defendant's allocution statement).

However, although the trial court's discretion is broad, it is limited by the rules governing the conduct of the trial. In a criminal prosecution, the trial court may not permit either party to conduct pretrial examination of witnesses except in certain limited circumstances. For example, the statutes governing pretrial discovery in criminal matters do not permit either the defendant or the state to take pretrial depositions. ORS 135.805 to 135.873 (setting out rules for pretrial discovery in criminal prosecutions). Moreover, ORS 136.420 provides that, in a criminal trial, after the jury is sworn, all testimony "shall be given orally in the presence of the court and jury," except in certain circumstances not relevant here. This court has held that that statute "'was intended to make the general rule, concerning the taking of depositions, inapplicable to criminal trials.'" *State v. Lamphere*, 233 Or 330, 332-33, 378 P2d 706 (1963) (quoting *State v. Walton*, 53 Or 557, 565, 99 P 431 (1909)) (referring to virtually identically worded earlier version of statute); *State ex rel Gladden v. Lonergan*, 201 Or 163, 181, 269 P2d 491 (1954) (to same effect). In this case, as we shall explain, we conclude that the trial court, in permitting the prosecutor to question Davenport extensively about the events surrounding the murder, exceeded its discretion to manage courtroom proceedings, and, instead, effectively permitted an unlawful pretrial deposition of a defense witness.

As noted, after the jury was selected in this case but before it was sworn, the trial court conducted a hearing, the stated purpose of which was to determine whether certain witnesses would testify at trial. It is indisputable that it was within the trial court's discretion to determine, at that point, whether the witnesses would testify, including whether the witnesses would respond to questions from both defense counsel and the prosecutor, and to do so by permitting the prosecutor to question the witnesses. Although the trial court later would have the option of excluding some or all of a witness's testimony if the witness refused to answer

the prosecutor's questions at trial, *Cox*, 337 Or at 493, the court reasonably could have concluded that permitting the prosecutor to question the witness at the hearing to test the witness's compliance was preferable to that course of action. However, with respect to Davenport, the trial court went well beyond simply determining whether the witness would testify. Before the prosecutor started to question Davenport about the events surrounding the murder, Davenport had stated under oath that he would testify about those events, and he had amply demonstrated that he would answer the prosecutor's questions.

It is true that Davenport initially resisted answering questions about his relationship with a certain prison gang, but he did eventually answer all of the prosecutor's questions on that topic, and he had appropriately answered questions about his relationship with defendant. At the point when defense counsel interposed his second objection to the prosecutor's questions, Davenport also had answered several questions about the murder itself. At that point, requiring Davenport to answer questions from the prosecutor that essentially revealed the entirety of Davenport's substantive testimony about defendant's participation in the murder exceeded the legitimate purpose of the hearing. The prosecutor's continued questioning of Davenport constituted, in essence, a pretrial deposition—the sort of discovery that is not permitted under the statutes governing pretrial discovery in criminal matters and that is prohibited by the requirement in ORS 136.420 that all testimony "shall be given orally in the presence of the court and jury." We conclude, therefore, that the trial court erred in overruling defense counsel's second and third objections to the prosecutor's continued questioning of Davenport about the events surrounding the murder.

As this court has often explained, however, not all errors require reversal. An error is not a ground for a new trial if it is harmless—that is, if the court determines that there is little likelihood that it affected the verdict. *State v. Rogers*, 352 Or 510, 543, 288 P3d 544 (2012) (*Rogers II*). Defendant argues that the trial court's decision to allow the pretrial examination of Davenport was harmful to his case and likely affected the verdict, because the prosecution was

able to use Davenport's hearing testimony not only to decide which questions to ask Davenport, but also to impeach Davenport with his prior answers when his trial testimony diverged from his testimony at the hearing. Defendant argues that Davenport's credibility was key to the jury's determination of defendant's guilt and that the prosecution was able to use Davenport's hearing testimony to undermine his credibility.

We agree that Davenport's testimony was central to the defense case; his testimony, if believed, tended to exculpate defendant. However, we are not persuaded that the prosecutor's improper pretrial questioning of Davenport had a significant effect on Davenport's credibility at trial or was likely to have affected the verdict.

Defendant identifies no significant benefit that the prosecution gained at trial from improperly cross-examining Davenport during the pretrial hearing. With respect to the prosecution's use of Davenport's pretrial hearing testimony to decide which questions to ask him at trial, defendant argues only that the prosecutor "confidently used previewed *** testimony" about Davenport's relationship with and knowledge of the gang during extended questioning on that topic at trial and, in closing, repeatedly urged the jury to find that Davenport had lied in his responses to that questioning. However, as described above, the trial court did not err in permitting questioning about Davenport's gang involvement; rather, the error that we have identified relates to questioning that took place after that line of questioning concluded. It follows that defendant cannot rely on the prosecution's use of Davenport's pretrial testimony about his gang involvement for cross-examination purposes to support an argument that the trial court committed reversible error.

As for the prosecution's use of Davenport's pretrial hearing testimony for impeachment purposes at trial, defendant points to only one instance in which the prosecutor used Davenport's hearing testimony to undermine his credibility at trial. During cross-examination, the prosecutor pointed out that Davenport had testified at the pretrial hearing that defendant had had no knowledge of Davenport's plan to murder the victim and that defendant had done nothing

to prepare himself before entering the victim's cell. But on direct examination at trial, Davenport testified that both he and defendant had donned gloves before entering the cell, which he conceded was a step in preparation for what was going to happen. The prosecutor focused on that inconsistency to undermine Davenport's testimony at trial. However, any damage to Davenport's credibility from the prosecutor's ability to draw attention to that one small discrepancy between Davenport's hearing testimony and his trial testimony is dwarfed by the fact that much of Davenport's trial testimony was contradicted or undermined by other evidence and testimony admitted independently of the prosecutor's use of Davenport's hearing testimony for impeachment purposes.

For instance, on direct examination by defendant, Davenport testified, among other things, that he goaded and threatened defendant into entering the victim's cell against his will; that Davenport and Davenport alone murdered the victim, using both the concrete block and the shank to inflict all of the injuries on the victim while defendant cowered and watched; and that defendant knew nothing about what would happen in the victim's cell other than that the victim had offended Davenport and Davenport wanted to teach the victim a lesson. That story was not plausible, and it was inconsistent with other testimony and evidence presented at trial. Specifically, it was undisputed that defendant entered the victim's cell wearing gloves and that he did not leave when Davenport began hitting the victim with the concrete block, even though the cell doors were still open at that time. Several corrections officers testified that they saw defendant punching and kicking the victim, and there was blood on defendant's gloves and shoes to support that testimony. And, when defendant was asked by a corrections officer after the murder whether he was carrying a weapon, defendant responded that he had left his weapon on a table in the victim's cell, where the shank was later found.

Similarly, Davenport's testimony about his gang involvement was internally inconsistent and in conflict with the testimony of other witnesses. Davenport admitted that he had been a member of a gang for some time, that he had been the cellmate of two other gang members,

and that he had known most of the other gang members for years. Additionally, another member of the gang testified about Davenport's participation in gang activities, including that Davenport had attended multiple meetings at which gang leaders talked about having the victim killed and that Davenport had volunteered to kill the victim. Nonetheless, at defendant's trial, Davenport consistently denied knowing anything about how the gang operated, its power structure, the nicknames or roles of any the gang's other members, or that its leaders wanted the victim murdered.

Because defendant has identified no specific testimony from the pretrial hearing that the prosecutor was able to use in cross-examining Davenport that was not also supported by other evidence, and because there were other inconsistencies in Davenport's testimony that called his credibility into question, we conclude that the prosecutor's improper cross-examination of Davenport at the pretrial hearing was not likely to have affected the verdict. We therefore hold that, although the trial court erred in permitting the prosecutor to examine Davenport extensively about the murder outside the presence of the jury, that error was harmless.

As previously noted, we have considered the other assignments of error that defendant claims arose during the guilt phase and found them to be without merit. Having found no reversible error during that phase of the trial, we affirm defendant's conviction for aggravated murder.

B. *Trial Court's Ruling that Defendant Is Not Ineligible for the Death Penalty Due To Intellectual Disability*

Three assignments of error relate in some way to defendant's contention that he is intellectually disabled. We begin by addressing defendant's argument that the trial court erred in denying, before trial, defendant's "Motion Number 20," in which defendant moved the court for a ruling that he was ineligible for the death penalty because he was intellectually disabled.[7]

---

[7] After the jury's penalty-phase verdict, defendant also filed a sentencing memorandum in which he argued that the verdict did not authorize a death sentence, because, among other things, it would be unconstitutional to sentence him to death when he had established functional deficits equivalent to, and in many instances worse than, other individuals who have been deemed

We discuss the law governing defendant's eligibility for the death penalty in detail below. To put the description of defendant's assignments of error in context, however, it is helpful at this point to explain that, in 2002, the United States Supreme Court held in *Atkins* that, in light of evolving standards of decency, the death penalty is excessive, cruel, and unusual under the Eighth Amendment to the United States Constitution when applied to intellectually disabled offenders.[8] 536 US at 321. The Court explained that the intellectually disabled should be held responsible for their crimes and they should be punished for them, but that, "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses, * * * they do not act with the level of moral culpability that characterizes the most serious adult offenders." *Id*. at 306. However, the Court stated, not all people who claim to be intellectually disabled "will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317. The Court noted that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that become manifest before age 18." *Id*. at 318. But the Court declined to set a standard for determining whether an offender is intellectually disabled or to specify a particular procedure for making that determination. Rather, the Court left it to the states to develop "appropriate ways to enforce

intellectually disabled. He argued that, because the court found that he suffered from partial fetal alcohol syndrome, the Eighth Amendment and the Privileges and Immunities Clause prohibited his execution, because there is no rational way to distinguish defendant from those individuals found to be exempt from the death penalty. Defendant contended that, although his IQ might be higher, he functions in the real world with the same deficits as, or worse than, individuals classified as intellectually disabled. Defendant orally renewed that argument during the sentencing hearing. The trial court sentenced defendant to death without expressly ruling on or otherwise addressing that particular argument. In his brief to this court, defendant assigns error to the trial court's effective rejection of his argument. However, defendant does not make a separate argument relating to the trial court's failure to respond to his post-verdict arguments. We therefore address that matter in the context of our discussion of the denial of defendant's pretrial motion for a ruling that he was ineligible for the death penalty because of his intellectual disability.

[8] The Eighth Amendment to the United States Constitution provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

the constitutional restriction" on executing intellectually disabled persons. *Id.* at 317.

In 2010, when defendant moved the trial court to declare him ineligible for the death penalty because of his intellectual disability, Oregon had not yet developed a way to enforce the constitutional restriction against executing intellectually disabled offenders. Indeed, in the years since the Supreme Court decided *Atkins*, the Oregon legislature has not adopted any procedure for determining whether a person accused of aggravated murder has an intellectual disability and, therefore, ineligible for the death penalty. Nor has the issue been addressed by the Oregon appellate courts before today.[9] Lacking such guidance, the trial court

---

[9] In fact, although Oregon's Constitution, like the federal constitution, prohibits cruel and unusual punishment, Or Const Art I, § 16, this court has not previously announced a categorical prohibition on the execution of persons with intellectual disabilities. Defendant urges this court to adopt the same standard under Article I, section 16, that the United States Supreme Court has recognized for the Eighth Amendment. Defendant, however, having acknowledged that this court has never announced a categorical ban on the execution of any class of offenders, does no more than assert that "it stands to reason" that Article I, section 16, "does contemplate such categorical bans." That is so, he states, because the texts of the state and federal constitutional provisions are similar and this court's interpretations of Article I, section 16, have generally followed the Supreme Court's interpretations of the Eighth Amendment. The state, for its part, argues that defendant failed to preserve an argument that Article I, section 16, prohibits the execution of intellectually disabled persons. Because neither party has made a developed legal argument about the scope of Article I, section 16, and because the Supreme Court's Eighth Amendment jurisprudence clearly prohibits the execution of intellectually disabled persons, we depart from our normal course—starting our analysis by considering Oregon constitutional law—and begin instead with the parties' federal constitutional arguments.

Defendant also argues at length that both Article I, section 16, of the Oregon Constitution and the Eighth Amendment categorically prohibit the execution of any person with "reduced mental capacity," whether the person suffers from "intellectual disability" as that term is defined in the medical literature, or from partial fetal alcohol syndrome like defendant, or from any condition that similarly reduces the person's culpability for his or her actions. That is so, defendant argues, because inflicting the death penalty on such a person does not meaningfully advance the retributive or deterrent purposes of the death penalty. In response, the state points out that defendant does not define the contours of "reduced capacity," other than to suggest that any person who "functions like an intellectually disabled person" is exempt from the death penalty. In addition, the state contends, defendant did not make that argument below, and, therefore, it is not preserved.

As discussed in the text, the Supreme Court has held that there is a national consensus against executing a person with "intellectual disability," a diagnosis specifically defined in the medical literature. Assuming for purposes of argument that the Court's rationale for categorically exempting intellectually disabled

in this case invited suggestions from the parties about how to proceed and ultimately concluded that it would conduct a pretrial hearing, which we refer to as an *Atkins* hearing, during which both sides would present evidence on defendant's mental health and abilities as well as on the prevailing standards for making the determination of intellectual disability. For defendant to be found intellectually disabled and, therefore, ineligible for the death penalty, the trial court ruled, defendant would have to establish that he was intellectually disabled by a preponderance of the evidence.

At the ensuing hearing, in April 2011, both defendant and the state offered evidence from psychiatrists and psychologists on defendant's intellectual functioning. The evidence at that hearing comprised expert testimony, written reports of experts, and documentary evidence of psychological and medical testing of defendant. The parties' experts all generally agreed on the applicable criteria,[10] defendant's scores on standardized tests, and most of defendant's diagnoses. They disagreed, however, about how to apply those criteria in evaluating defendant and about the significance of the standardized test scores in making the ultimate determination of whether defendant has an intellectual disability.

In 2011, the diagnostic criteria for intellectual disability, widely accepted and derived from the medical literature, amounted to a three-pronged inquiry into (1) the person's intellectual functioning, (2) the person's adaptive behavior (how the person functions in day-to-day life), and (3) whether the disability manifested before adulthood. That

---

persons from execution would apply equally to all individuals with intellectual deficits similar in severity to those required for a diagnosis of intellectual disability, the Court has not extended the categorical exemption from the death penalty to persons with "reduced mental capacity" who do not meet the criteria for a diagnosis of "intellectual disability." We therefore decline to consider the issue in this case.

[10] Both the defense and prosecution relied extensively on two manuals that provide diagnostic criteria for intellectual disability: the Fourth Edition (text revision) of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th ed - Text Revision 2000) (in effect when defendant committed his crimes and at the time of his trial), as well as the American Association on Intellectual and Developmental Disabilities' *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed 2010).

paradigm was reflected in the Fourth Edition (text revision) of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th ed - Text Revision 2000) (*DSM-IV-TR*), which defined "mental retardation" as a condition that meets the following three criteria:

"A.   Significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test \* \* \*.

"B.   Concurrent deficits or impairments in present adaptive functioning \* \* \* in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

"C.   The onset is before age 18 years."

*DSM-IV-TR* at 49.[11] Under the *DSM-IV-TR*, the severity of a person's mental retardation was measured by the person's IQ score. A person with an IQ score between about 50-55 and approximately 70 (two standard deviations below normal) was considered to be mildly mentally retarded and to have significantly subaverage intellectual functioning.[12] *Id.*

The parties introduced evidence that defendant's IQ score was measured at 82 or 84 (depending on the test), which is in the borderline range.[13] They also adduced evidence that defendant suffered from some kind of psychosis

---

[11] As we will explain, in 2013, the *DSM-IV-TR* was replaced by the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (5th ed 2013).

[12] A person scoring 100 on an IQ test is considered to have an average level of cognitive functioning. *Atkins*, 536 US at 309 n 5. Under the *DSM-IV-TR*, a person with an IQ between 35-40 to 50-55 was characterized as moderately mentally retarded, 20-25 to 35-40 as severely mentally retarded, and under 20-25 as profoundly mentally retarded. *DSM-IV-TR* at 49.

[13] Under the *DSM-IV-TR*, "[b]orderline intellectual functioning \* \* \* describes an IQ range that is higher than that for Mental Retardation (generally 71-84)." *DSM-IV-TR* at 48.

Experts administered two IQ tests to defendant: the Wechsler Adult Intelligence Scale - Fourth Edition (WAIS-IV), and the Stanford-Binet Intelligence Scales, Fifth Edition (SB5). Both tests have subtests. On the WAIS-IV, defendant's full-scale IQ score was 82 and his subtest scores ranged from 74 (working memory) to 102 (perceptual reasoning). On the SB5, defendant's full-scale IQ score was 84, and his subtest scores ranged from 78 (non-verbal) to 92 (verbal).

disorder,[14] as well as partial fetal alcohol syndrome,[15] among other things. Defendant's experts testified that defendant's adaptive functioning was equivalent to that of a seven-and-a-half-year-old and that he had significant functional impairment in each of the 11 areas identified in the *DSM-IV-TR* for measuring adaptive functioning. The state's expert agreed that defendant's adaptive functioning score was more than two standard deviations below the mean—in the range consistent with mild "mental retardation."

Two state experts, Dr. Hulteng and Dr. Sebastian, testified at the *Atkins* hearing that the generally accepted practice in the field of psychology was that a person must have an IQ score of two standard deviations below the mean or lower (an IQ score of 70 or lower) to permit a diagnosis of intellectual disability, irrespective of the person's adaptive behavior. Dr. Hulteng testified that, in his opinion, a person with an IQ score of over 75 could never qualify as intellectually disabled. Specifically with respect to this case, Dr. Hulteng and Dr. Sebastian (who had acted as a consultant but did not personally examine defendant) testified that defendant's IQ scores were too high to establish the first prong in the diagnosis of mental retardation: "significantly subaverage intellectual functioning."

Defendant's experts testified that an IQ above two standard deviations below the mean did not exclude an intellectual disability diagnosis. They relied on the American Association on Intellectual and Developmental Disabilities (AAIDD) *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed 2010), which they referred to as the "Green Book" because of the color of its cover. According to defendant's experts, the AAIDD Green Book

---

[14] One of defendant's experts diagnosed defendant with "Psychotic Disorder (NOS [Not Otherwise Specified]) and/or Amphetamine-Induced Psychotic Disorder, with Delusions and Hallucinations." A state expert diagnosed "Psychotic Disorder (NOS)."

[15] According to Dr. Adler, a defense expert and medical doctor who conducted a forensic psychiatric evaluation of defendant, individuals with partial fetal alcohol syndrome have a confirmed history of prenatal alcohol exposure and the same level of damage to the central nervous system and the same functional disabilities as are present with fetal alcohol syndrome, but they do not have all the same facial deformities that a person with fetal alcohol syndrome would have, and therefore do not have the same "look" as a person with fetal alcohol syndrome.

places more emphasis on a person's adaptive behavior in an intellectual disability diagnosis.[16] One of defendant's experts, Dr. Greenspan, testified that IQ tests offer an incomplete picture of intelligence, because a person with partial fetal alcohol syndrome, like defendant, cannot apply his or her IQ to day-to-day activities. Therefore, a broader definition that measures the way a person functions should be used to diagnose intellectual disability. Dr. Greenspan concluded, under both the AAIDD Green Book and *DSM-IV-TR*, that defendant met the first prong in the diagnosis of mental retardation (significantly subaverage intellectual functioning), because he has significant intellectual deficits, and that defendant is intellectually disabled.

In addition, defense expert Dr. Connor, a neuropsychologist, testified that defendant's IQ scores were invalid because of the significant differences among the IQ subscores, such as scores for verbal and nonverbal or perceptual reasoning. He pointed to an MRI showing that defendant has brain damage, evidenced by a visible defect in his corpus callosum,[17] which likely caused that difference in IQ subscores. Further, Dr. Connor testified that partial fetal alcohol syndrome together with defendant's corpus callosum damage and his low adaptive functioning supported a diagnosis of intellectual disability. For similar reasons, another defense expert, psychiatrist Dr. Adler, concluded that defendant's IQ score was not alone determinative of his intellectual functioning. Dr. Adler also ultimately diagnosed defendant as intellectually disabled.

At the conclusion of the hearing, the trial court found that defendant suffered from partial fetal alcohol syndrome. The court observed that defendant's experts had opined that, because of defendant's partial fetal alcohol syndrome,

---

[16] For instance, the AAIDD Green Book provides the following definition of intellectual disability:

"Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18."

AAIDD Green Book at 5.

[17] The corpus callosum is a mass of nerve fibers that connects the two sides of the brain. Dr. Connor testified that the damage to defendant's corpus callosum was caused by his mother's consumption of alcohol during pregnancy.

defendant's IQ scores were not as important as their own clinical judgment and the results of defendant's neuropsychological tests to their analyses of defendant's intellectual functioning. Nonetheless, however, the court concluded that the consensus in the psychological community, as evidenced by the *DSM-IV-TR* and the AAIDD Green Book, was that IQ is the appropriate measure for diagnosing intellectual disability. Therefore, because defendant's IQ was about 84, the court found that defendant had failed to prove "significantly subaverage intellectual functioning" under the first prong. And, because defendant's IQ scores precluded a finding of "significantly subaverage intellectual functioning" under prong one, the court declined to consider prongs two (deficits or impairments in adaptive functioning) and three (onset in childhood):

> "Defendant has not proved by a preponderance of the evidence that he meets the Prong One, 'significantly sub-average intellectual functioning.' For this reason, the court does not reach Prongs Two and Three. One of Dr. Sebastian's slides was a picture of overlapping circles that illustrates the simple truth about this case: *Atkins* does not bar the execution of all persons with [fetal alcohol syndrome]. There are people with [intellectual disability]. There are people with [fetal alcohol syndrome]. There is a small group in the middle that has both. Unfortunately, defendant falls outside of that group."

Notwithstanding that the trial court expressly declined to reach the second prong, the court found that, "[a]s to Prong Two, adaptive functioning, defendant scored more than two standard deviations below the mean on the [relevant] tests, averaging minus 2.5."[18] The court added, however, that, even though it had found that defendant suffered from partial fetal alcohol syndrome, which affected his adaptive functioning, there was no generally accepted scientific opinion in the field of psychology that a diagnosis of intellectual disability should be made based only on adaptive functioning. The court concluded that it could not depart from the three criteria mentioned in *Atkins* (that

---

[18] Additionally, although the trial court did not make a specific finding on the point, we observe that there appears to have been little dispute that defendant's intellectual deficits manifested before age 18.

is, essentially, the three prongs set out in the *DSM-IV-TR*) and the consensus of professional judgment to conclude that defendant is ineligible for the death penalty.

In this court, defendant first repeats the argument he made below that the trial court should have relied on his experts' conclusions that, under the *DSM-IV-TR* and the AAIDD Green Book, defendant is intellectually disabled notwithstanding his relatively high IQ scores, because his partial fetal alcohol syndrome and the resulting deficits in his adaptive functioning significantly impaired his intellectual functioning. He contends that the trial court appeared to have concluded that it was legally bound to side with the state's experts, because their interpretation of the *DSM-IV-TR* and the AAIDD Green Book—applying a bright-line rule requiring an IQ score of more than two standard deviations below the mean for a determination of intellectual disability—was more in line with that of a majority of psychologists and psychiatrists. However, he argues, experts' opinions should not be discounted simply because they reflect minority views. In support of the latter proposition, defendant quotes from this court's opinion in *State v. Wagner*, 305 Or 115, 153-54, 752 P2d 1136 (1988), *vac'd and remanded on other grounds by Wagner v. Oregon*, 492 US 914 (1989) (*Wagner I*):

> "In *Bales v. SAIF*, 294 Or 224, 656 P2d 300 (1982), we made it clear that a decision as to which of two conflicting schools of medical thought is correct is not a question of law; it is a question of fact to be decided by presenting in proper evidentiary form the various views to the finder of fact. \*\*\* We also observed that the opinion of an expert should not necessarily be given less weight by a finder of fact just because the witness espouses the view of a minority of his profession."

Defendant argues that, in this case, the so-called "minority" view was held by one of his witnesses, Dr. Greenspan, whom the trial court acknowledged to be an expert in intellectual disability and the author of many studies relied on by the AAIDD in formulating its definition of intellectual disability, as well as by Drs. Adler and Connor. Therefore, he continues, the trial court had sufficient evidence on which to base a conclusion that defendant had deficits in intellectual functioning that rendered him intellectually disabled.

As discussed, at the *Atkins* hearing, the trial court found that *Atkins*, the *DSM-IV-TR*, and the AAIDD Green Book all generally required proof of three elements for a finding of intellectual disability: significantly subaverage intellectual functioning, significant limitations in adaptive skills, and onset before the age of 18. The court concluded, based on *Atkins*, on its own interpretation of the clinical manuals, and on the testimony of the state's experts, that all three elements, or "prongs," must be met before the court could conclude that defendant is intellectually disabled.

The trial court stated that the dispute "is not about whether intellectual disability should be measured according to a rigid cutoff or fixed intelligence test score;" rather, it boiled down to "what weight the court should give to both the general IQ score and the sub scores in determining whether this defendant has 'significantly sub average intellectual functioning.'" In deciding what weight to give to IQ scores, the court stated that it would rely on the *DSM-IV-TR* and the AAIDD Green Book, which, the court found, both gave significant relevance and weight to IQ scores. Based on its interpretation of those clinical manuals and the testimony of the state's experts, the court concluded that defendant's IQ scores and subtest scores were too high to permit a finding, under the first prong, of "significantly subaverage intellectual functioning." In addition, the court ruled that, even if IQ scores were irrelevant, defendant could not prove intellectual disability, because his neuropsychogical test scores were too high for a finding of significantly subaverage intellectual functioning. Finally, the court concluded that there was no generally accepted scientific opinion in the field of psychology that diagnosis of intellectual disability should be based solely on adaptive functioning. Principally for those reasons, the court rejected the opinions of defendant's experts that defendant was intellectually disabled.

The trial court thus considered and weighed the evidence presented at the *Atkins* hearing and, based on that evidence, ruled that defendant had not met his burden of establishing ineligibility by a preponderance of the evidence. The trial court did not, as defendant suggests, use a bright-line rule requiring an IQ score of at least two

standard deviations below the mean for a determination of intellectual disability in determining whether defendant had made the necessary showing. The trial court determined that defendant had not met the first prong—the intellectual functioning prong—based on his IQ scores, but it did not end its analysis there. Rather, as described, the court considered defendant's IQ subtest scores and the results of other neuropsychological tests administered by the examining psychologists and psychiatrists and found them all to be insufficient to establish intellectual disability. For those reasons, we conclude that the trial court's *Atkins* ruling was not erroneous at the time it was made, and we reject defendant's argument to the contrary.

Alternatively, defendant argues that the publication of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (5th ed 2013) (*DSM-5*) in May 2013, after the verdict was rendered in this case, significantly altered the central premise of the trial court's legal conclusion, and, therefore, viewed in the light of present circumstances, the trial court's ruling was erroneous. He asserts that the new *DSM-5* diagnostic criteria for intellectual disability depart from a rigid reliance on IQ test scores and are in line with the views of his experts, and that they therefore raise serious questions about the trial court's conclusion. He also contends that the Supreme Court's recent decision in *Hall v. Florida*, 572 US __, 134 S Ct 1986, 188 L Ed 2d 1007 (2014), issued during the pendency of this appeal, supports that view. Defendant therefore urges the court to remand the case for a new evidentiary hearing in light of current scientific knowledge, so that the trial court can make a determination of intellectual disability under a proper understanding of prevailing medical practice. *See State v. Lawson/James*, 352 Or 724, 291 P3d 673 (2012) (reversing and remanding for a new evidentiary hearing based on current scientific research and literature in area of witness identification).

The state responds that neither the *DSM-5* nor *Hall* changed either the definition of intellectual disability or the legal landscape in a way that materially affects the validity of the trial court's determination. The state argues that, under both the *DSM-5* and *Hall*, intellectual functioning

is an independent criterion to be met, and IQ is still a key diagnostic feature in that determination.

As we explained above, the *DSM-IV-TR* required three diagnostic criteria to be met for a diagnosis of intellectual disability: significantly subaverage intellectual functioning, as evidenced by an IQ of approximately 70 or below; concurrent deficits in adaptive functioning; and onset before age 18. *DSM-IV-TR* at 39-49. The *DSM-5* continues to require three similar criteria, but it deemphasizes reliance on test scores and emphasizes that the defining quality of intellectual disability is the inability to function in day-to-day life:

> "Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains. The following three criteria must be met:
>
> "A.   Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.
>
> "B.   Deficits in adaptive functioning that result in failure to meet developmental and socio-cultural standards for personal independence and social responsibility. * * *
>
> "C.   Onset of intellectual and adaptive deficits during the developmental period."

*DSM-5* at 33. Where the *DSM-IV-TR* referred to "significantly subaverage intellectual functioning," the *DSM-5* uses the term "deficits in intellectual functions." Where the *DSM-IV-TR* specifically pointed to "an IQ of approximately 70 or below on an individually administered IQ test" as establishing "significantly subaverage intellectual functioning," the *DSM-5* deletes reference to particular IQ scores, emphasizing instead that clinical assessment and standardized test results *confirm* a person's deficits in intellectual functions. Similarly, the *DSM-IV-TR* categorized "mental retardation" by degree of severity—mild, moderate, or severe—based solely on IQ scores. *DSM-IV-TR* at 42. The *DSM-5*, by contrast, provides that severity level is defined by adaptive functioning, not by IQ score:

"The various levels of severity are defined on the basis of adaptive functioning, and not IQ scores, because it is adaptive functioning that determines the level of supports required."

*DSM-5* at 33.

Although the *DSM-5* recognizes that "[i]ntellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence" (*i.e.*, IQ tests) and that "[i]ndividuals with intellectual disability have scores of approximately two standard deviations or more below the population mean," it nonetheless states that "[c]linical training and judgment are required to interpret test results and assess intellectual performance." *Id.* at 37. It notes, further, that

"IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests."

*Id.*

Those differences reflect a significant change in the way that intellectual disability is diagnosed, and appear to permit a finding of "deficits in intellectual functions," *DSM-5* at 33 paragraph (A), and a diagnosis of intellectual disability, based in part on significant deficits in adaptive functioning, as defendant's experts suggested at the *Atkins* hearing. The Supreme Court recognized as much in *Hall*. As the Court stated, under the *DSM-5*, "an individual's ability or lack of ability to adapt or adjust to the requirements of daily life, and the success or lack of success in doing so, is central to the framework followed by psychiatrists and other professionals in diagnosing intellectual disability." 134 S Ct at 1991; *see also* 134 S Ct at 2006 (Alito, J., dissenting) (*DSM-5* "fundamentally alters the first prong of the long-standing, two-pronged definition of intellectual disability

that was embraced by *Atkins* and has been adopted by most States. In this new publication, the [American Psychiatric Association] discards 'significantly subaverage intellectual functioning' as an element of the intellectual-disability test.").

In *Hall*, the court considered the constitutionality of a Florida statute that defined intellectual disability to require an IQ test score of 70 or less. The defendant in that case, Hall, had an IQ of 71, which was within the margin of error for the test, but the Florida Supreme Court held that, under the state statute, Hall was not entitled to a hearing to try to establish his intellectual disability and resulting ineligibility for the death penalty. The Supreme Court held that, when a defendant has an IQ score between 70 and 75, the defendant's lawyers must be allowed to offer additional clinical evidence of intellectual deficit, including the inability to learn basic skills and adapt to changing circumstances. 134 S Ct at 2001. In reaching that conclusion, the Court observed that the existence of concurrent deficits in intellectual and adaptive functioning are the defining characteristics of intellectual disability. *Id*. at 1994. The Court noted that, on its face, the Florida statute could have been construed consistently with the way intellectual disability was discussed in *Atkins*, which relied on the *DSM-IV-TR* in articulating the views of the medical community about how intellectual disability should be measured and assessed. *Id*. However, the Court stated, the Florida Supreme Court's interpretation of its statute to bar a person with an IQ score over 70 from presenting other evidence showing that his or her faculties were limited created an unacceptable risk that persons with intellectual disability will be executed, and was therefore unconstitutional, because it did not permit the court to consider evidence of deficits in the defendant's adaptive functioning. The Court explained:

> "Pursuant to this mandatory cutoff, sentencing courts cannot consider even substantial and weighty evidence of intellectual disability as measured and made manifest by the defendant's failure or inability to adapt to his social and cultural environment, including medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances. This is

so even though the medical community accepts that all this evidence can be probative of intellectual disability, including for individuals who have an IQ test score above 70. * * *

"Florida's rule disregards established medical practice in two interrelated ways. It takes an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence. It also relies on a purportedly scientific measurement of defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise."

*Id*. at 1994-95.

It is true that defendant's IQ in this case is higher than that of the defendant in *Hall*, and, in fact, higher than the range of scores that the Court was specifically concerned with in *Hall*. We also recognize that, unlike the Florida Supreme Court, the trial court in this case did not use a strict numerical cutoff when deciding that defendant had not met his burden of proof. However, the Court's statements in *Hall* about the need to consider a defendant's serious deficits in adaptive functioning in determining intellectual disability for purposes of ineligibility for the death penalty apply with equal force in the present circumstances. In this case, the trial court concluded that it would be inappropriate to consider defendant's deficits in adaptive functioning in determining whether defendant demonstrated significantly subaverage intellectual functioning under the *DSM-IV-TR*'s first prong, and it rejected the opinions of defendant's experts because they considered defendant's deficits in adaptive functioning due to partial fetal alcohol syndrome to diagnose him as intellectually disabled. The trial court ruled that, because of defendant's relatively high scores on IQ and other neuropsychological tests, it would not consider evidence of defendant's adaptive functioning deficits. As we have stated, that ruling was correct when it was made, as viewed under then-existing published medical standards.

Those standards, however, were undergoing change, as the testimony of defendant's medical experts suggested, and the changes are reflected in the *DSM-5*. Relying on the new standards, the Court in *Hall* reversed a Florida decision because it precluded the trial courts in that state from considering "even substantial and weighty evidence

of intellectual disability as measured and made manifest by the defendant's failure or inability to adapt to his social and cultural environment, including medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances." *Hall*, 134 S Ct at 1994. In this case, the trial court also did not consider that kind of evidence.

In *Atkins* and in *Hall*, the Court observed that individuals who meet the "clinical definitions" of intellectual disability bear diminished personal culpability, because, by definition, they have diminished capacity to understand and process information, to communicate, to learn from their mistakes and experiences, to engage in logical reasoning, to control impulses, and to understand the reactions of others. *Hall*, 134 S Ct at 1993; *Atkins*, 536 US at 318. As we have explained, under the *DSM-5*, the clinical definition of intellectual disability permits consideration of evidence to support a finding of a deficit in intellectual functioning that the trial court in this case believed should be disregarded. The *DSM-5* no longer requires proof of "significantly subaverage intellectual functioning." Instead, it simply requires "deficits" in intellectual functioning, which may be shown in a variety of ways and confirmed by clinical assessment and standardized tests. Thus, the consensus of the psychological community, as reflected in the *DSM-5*, now recognizes that intellectual functioning should be interpreted in conjunction with adaptive functioning in diagnosing intellectual disability. *DSM-5* at 37 ("The diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functioning.").

As we have described, that was essentially the position that defendant's experts took at the *Atkins* hearing. The current consensus in the psychological community on this point is, however, inconsistent with the trial court's rejection of defendant's experts' diagnosis of intellectual disability on the basis that there is no generally accepted scientific opinion in the field of psychology that adaptive functioning plays a role in the determination of a deficit in intellectual function. For that reason, even though the trial court's ruling comported with the published standards existing at the time that the court ruled, we now conclude that the trial

court did not apply now-current medical standards in determining that defendant had not met his burden of proof to show that he has an intellectual disability.

This court has recognized that a high level of scrutiny is required in death penalty cases:

> "Capital cases require our most vigilant and deliberative review. We agree with the United States Supreme Court statement that '[d]eath is a punishment different from all other sanctions in kind rather than degree' so that 'there is a [corresponding] difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' *Woodson v. North Carolina*, 428 US 280, 303-05, 96 S Ct 2978, 2991, 49 L Ed 2d 944, 961 (1976)."

*State v. Guzek*, 322 Or 245, 264, 906 P2d 272 (1995). Allowing the trial court's ruling to stand would "create[] an unacceptable risk that [a] person[] with intellectual disability will be executed." *Hall*, 134 S Ct at 1990. We therefore remand for a new *Atkins* hearing, in which the trial court shall consider the evidence presented in light of the standards set out in the *DSM-5* and discussed in *Hall*.

## C.   *Defendant's Penalty-Phase Assignments of Error*

If, after a new *Atkins* hearing, the trial court again determines that defendant is eligible for the death penalty under *Atkins*, a second penalty-phase proceeding would not be required unless this court were to find reversible error in the penalty-phase proceeding below. Accordingly, we consider defendant's penalty-phase assignments of error to determine whether any is well taken.

### 1.   *Trial court's refusal to permit defendant's experts to testify about their diagnoses*

Defendant contends that the trial court erred during the penalty phase in refusing to allow his experts to testify that they had diagnosed defendant as intellectually disabled. Following the trial court's ruling at the *Atkins* hearing that defendant was eligible for the death penalty, defendant requested the trial court's permission to call Drs. Greenspan and Adler to testify that they had diagnosed defendant as intellectually disabled at a future penalty-phase hearing, in the event the jury convicted him

of aggravated murder at the conclusion of the guilt phase. Defendant explained that the prosecutor and the trial court had agreed that he could present evidence of intellectual disability during the penalty phase. Defendant argued that the jury should consider evidence of intellectual disability just like other mitigating evidence—something that could, but need not, merit a life sentence.

The trial court stated that it already had determined that defendant was not intellectually disabled. Therefore, the court reasoned, the jury must be permitted to consider and give effect to any mitigating evidence, but that requirement would be met if defendant were able to present evidence of his "diminished capacity." Near the close of the state's evidence during the penalty phase, defendant renewed his request that Drs. Greenspan and Adler be permitted to testify about their intellectual disability diagnoses. The court then ruled that "no party could introduce evidence that defendant was intellectually disabled, including evidence from defense experts that they had diagnosed defendant as intellectually disabled."

In this court, defendant argues that evidence that two experts diagnosed him as intellectually disabled was relevant to defendant's character and background and to the circumstances of the charged offense under ORS 163.150 and the Eighth Amendment. He argues that all relevant mitigating evidence is admissible in the penalty phase, and that, under the Eighth Amendment, evidence that experts diagnosed him as intellectually disabled is admissible even though the court had concluded that he was eligible for the death penalty under *Atkins* at a pretrial hearing on that issue. Defendant asserts that legal scholars have recognized that

> "the *Atkins* decision overruled the aspect of *Penry* [*v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989)] that had allowed the execution of mentally retarded persons. However, the Court's ruling in *Penry* that a defendant must be allowed to present all information to a jury that might be considered mitigating evidence, including evidence regarding mental capacity and childhood abuse, was not altered by the *Atkins* decision."

Ronald D. Rotunda and John E. Nowak, 3 *Treatise on Constitutional Law: Substance and Procedure* § 17.3(d), 46-47

(5th ed 2012). Indeed, defendant points out, the Supreme
Court has held that

> "a State cannot preclude the sentencer from considering
> any relevant mitigating evidence that the defendant prof-
> fers in support of a sentence less than death. *** [V]irtu-
> ally no limits are placed on the relevant mitigating evi-
> dence a capital defendant may introduce concerning his
> own circumstances[.]"

*Payne v. Tennessee*, 501 US 808, 822, 111 S Ct 2597, 115 L Ed
2d 720 (1991) (internal quotation marks and citations omit-
ted). Defendant argues that the trial court violated the
Eighth Amendment when it failed to permit the jury to give
effect to mitigating evidence that he had been diagnosed as
intellectually disabled. Finally, defendant argues that the
error requires reversal because it is likely that the error
affected the verdict and therefore was not harmless.

        The state responds that the trial court did not
preclude defendant from presenting any substantive evi-
dence of his mental and intellectual deficits, including any
diagnoses of those deficits and the factual bases for them;
it merely ruled that defendant could not elicit testimony
from his experts about their opinion on the ultimate legal
issue—whether defendant was intellectually disabled *as
that phrase is used in Atkins* for purposes of defining the
scope of the exemption from execution. The state argued
that that ruling was correct, because a witness is not enti-
tled to offer an opinion on a legal issue that is at variance
with the trial court's ruling. In its briefing before this court,
the state acknowledges, as it must, that "a witness is enti-
tled to offer an opinion within the proper scope of his or
her professional expertise." Additionally, in oral argument
in this court, the state conceded that, had defendant asked
his experts, during the penalty phase of the trial, to state
their diagnoses of defendant, their testimony to the effect
that they had diagnosed defendant as intellectually disabled
would have been admissible. However, the state argues, that
is not what happened here or what the trial court's ruling
addressed.

        Additionally, the state argues that the trial court
did allow defendant to present extensive relevant and

substantive evidence about his substantial mental and intellectual deficits, and his experts were permitted to testify about all their diagnoses, other than their diagnoses that defendant was intellectually disabled. The state contends that the specific opinion by defendant's experts that he is intellectually disabled would not have been relevant to any issue that was before the jury, because the trial court had already ruled that he is not intellectually disabled. That is, the state goes on, it was proper for the jury to hear and consider evidence regarding the nature, extent, and cause of defendant's intellectual deficits, and evidence on those points was admitted without restriction. But having the defendant's experts go one step further to opine that defendant is "intellectually disabled" would not have provided any additional meaningful information to the jury.

As a preliminary matter, after reviewing the record, we conclude that the state takes an overly narrow view of the trial court's ruling. In an Agreed Narrative Statement, signed by counsel for the state and defendant, the parties memorialized a discussion that they had had with the trial court in chambers during the penalty phase regarding "limitations on defendant's evidence." According to that statement,

> "defendant informed [the judge] of his intent to offer mitigating evidence that two of his experts, Drs. Adler and Greenspan, had diagnosed him as intellectually disabled. The evidence would have been identical to the evidence defendant offered during the pretrial hearing. *[The judge] ruled that no party could introduce evidence that defendant was intellectually disabled, including evidence from defense experts that they had diagnosed defendant as intellectually disabled.* [The judge] so ruled because she had ruled pretrial that defendant had failed to meet his burden to establish that he was ineligible for the death penalty because of intellectual disability and she concluded that no party could offer evidence inconsistent with that ruling."

(Emphasis added.) Thus, the agreed narrative confirms that defendant informed the court of his intention to offer his experts' diagnoses of intellectual disability as mitigating evidence and that the court precluded introduction of those diagnoses for any and all purposes, and not only to establish

that defendant was ineligible for the death penalty under *Atkins*.[19] It is true that the judge cited her earlier *Atkins* ruling as the reason for excluding the experts' diagnoses, but nothing in the Agreed Narrative Statement suggests that defendant would have been permitted to present evidence of his experts' intellectual disability diagnoses as mitigation evidence.

We also disagree with the state that evidence that two experts diagnosed defendant as intellectually disabled was irrelevant. The relevance standard set out in OEC 401[20] applies in the penalty phase of a capital trial, *State v. Stevens*, 319 Or 573, 580, 879 P2d 162 (1994), and that standard provides a "very low threshold for the admission of evidence." *State v. Gibson*, 338 Or 560, 569, 113 P3d 423 (2005). As we have already discussed, in the fields of psychology and psychiatry, intellectual disability is a valid clinical diagnosis, and evidence that defendant's experts made that diagnosis more than meets that low threshold for admissibility.

As defendant points out, the death penalty statutes plainly provide that a trial court must admit any evidence relevant to a sentencing jury's consideration of the sentence for aggravated murder. ORS 163.150(1)(a) provides that, in a penalty-phase proceeding,

"evidence may be presented as to any matter that the court deems relevant to sentence including, but not limited to,

---

[19] Attached to the Agreed Narrative Statement is an excerpt from the transcript in which the court summarized, on the record, the discussion of the court's rulings:

"[THE COURT:]  Next, I think we discussed in chambers the parameters of the expert testimony here, and we've agreed that there would not be testimony from an expert that went outside the parameters of my findings of fact in the *Atkins* hearing, nor would they—nor would there be cross-examination that went beyond those parameters. And I think we agreed that the 'as if' portion of my opinion is basically what these experts will be talking about, if that makes sense, and then you're free to cross-examine about that. Okay?"

The Agreed Narrative Statement acknowledges that that summary is "cryptic" and it recites that the "agreed narrative statement accurately describes the discussion and rulings to which the parties referred in the attached pages of the transcript."

[20] OEC 401 provides:

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

victim impact evidence relating to the personal character-
istics of the victim or the impact of the crime on the victim's
family and any aggravating or mitigating evidence relevant
to the issue in paragraph (b)(D) of this subsection[.]"

ORS 163.150(1)(b)(D), referred to in that passage, requires
the court to ask the penalty-phase jury to consider "[w]hether
the defendant should receive a death sentence," the so-called
"fourth question."[21] As this court stated in *Stevens*,

> "the legislature intended the scope of the statutory fourth
> question to be co-extensive with the scope of the fourth
> question held in *Penry* and [*State v. Wagner*, 309 Or 5, 786
> P2d 93 (1990) (]*Wagner II* [)] to satisfy the requirements of
> the Eighth Amendment to the Constitution of the United
> States."

319 Or at 582. As pertinent here, the Supreme Court held
in *Penry* that a defendant must be allowed to present all
information to a jury that might be considered mitigating
evidence, including evidence regarding mental capacity and
childhood abuse. 492 US at 328. And, in *Wagner II*, this
court held that all aspects of a defendant's character and
background are relevant to the jury's "exercise of a reasoned
moral response to the question 'should defendant receive a
death sentence?'" 309 Or at 19.

Dr. Greenspan, a recognized expert in intellec-
tual disability, and Dr. Adler, a forensic psychiatrist, had
diagnosed defendant as intellectually disabled, yet they
were required to omit from their testimony their profes-
sional opinions about that diagnosis—a matter squarely
within their expertise. Their diagnoses were relevant to

---

[21] The first three statutory questions, which, like the fourth question, the
jury must unanimously answer affirmatively to impose the death penalty, are:

"(A) Whether the conduct of the defendant that caused the death of the
deceased was committed deliberately and with the reasonable expectation
that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit
criminal acts of violence that would constitute a continuing threat to society;
[and]

"(C) If raised by the evidence, whether the conduct of the defendant in
killing the deceased was unreasonable in response to the provocation, if any,
by the deceased[.]"

ORS 163.150(1)(b)(A), (B), and (C).

defendant's character and background and to the circumstances of the offense under ORS 163.150 and under the Eighth Amendment, as explained in *Penry*. 492 US at 328 (intellectual disability is a mitigating fact that a trial court must permit a jury to consider under Eighth Amendment). The fact that the state's experts disagreed with the diagnosis does not render it any less relevant. *Wagner I*, 305 Or at 153-54 (expert's opinion should not necessarily be given less weight just because it reflects minority view). Nor does the fact that the trial court determined that defendant had not established his intellectual disability for purposes of the exemption from the death penalty under *Atkins*. As the Supreme Court has stated, "mental retardation for purposes of *Atkins*, and mental retardation as one mitigator to be weighed against aggravators, are discrete issues." *Bobby v. Bies*, 556 US 825, 829, 129 S Ct 2145, 173 L Ed 2d 1173 (2009). Evidence that defendant's experts had diagnosed him as intellectually disabled was relevant to the fourth question—whether the defendant should receive a sentence of death—and defendant was entitled under ORS 163.150 and the Eighth Amendment to present that testimony to the jury during the penalty phase of his death penalty trial as mitigating evidence. The trial court erred in excluding it.

As we have stated, under state law, this court must affirm notwithstanding error if there was "little likelihood" that the error affected the jury's verdict. *Rogers II*, 352 Or at 543. And when, as here, the error violates a defendant's federal constitutional right, the court may affirm "only when a 'reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.'" *State v. Bray*, 342 Or 711, 725, 160 P3d 983 (2007) (quoting *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986)). Under either standard, the trial court's error in refusing to permit defendant's experts to testify about their intellectual disability diagnoses was not harmless.

We have explained that the fourth question is a "mechanism for the sentencing jury to give meaningful effect to its consideration of the entire range of possible mitigating evidence and to provide a 'reasoned moral response'

to the ultimate question of whether the defendant should live or die." *Wagner II*, 309 Or at 13. For that reason, "it is the rare case in which this court can determine, when evidence relevant to that question is excluded, that the evidence could not have affected" the jury's decision whether to impose the death penalty. *Stevens*, 319 Or at 585. This is not that rare case. There is no burden of proof with respect to the fourth question; a juror may vote not to impose a death sentence for any reason. ORS 163.150(1)(c)(B).[22] Moreover, a sentence of death must be unanimous. ORS 163.150(1)(e).[23] Therefore, even if the fact that two experts had diagnosed defendant as intellectually disabled would not necessarily have convinced the jury that the state's experts were incorrect, we cannot say, beyond a reasonable doubt, that it would not have been sufficient to convince one juror to impose a sentence less than death.[24]

Because we hold that the trial court erred in refusing to allow defendant's experts to testify that they had diagnosed defendant as intellectually disabled and that that error was not harmless, we vacate defendant's sentence of death.

    2.   *The trial court's refusal to instruct the jury that it must determine whether defendant is intellectually disabled*

We address two additional issues that are likely to arise on remand if there is a further penalty phase proceeding. The first issue, which is related to the one that we just decided, is whether the trial court erred in refusing to

---

[22]  ORS 163.150(1)(c)(B) provides:

    "The court shall instruct the jury to answer the [fourth question] 'no' if, after considering any aggravating evidence and any mitigating evidence concerning any aspect of the defendant's character or background, or any circumstances of the offense and any victim impact evidence as described in paragraph (a) of this subsection, one or more of the jurors believe that the defendant should not receive a death sentence."

[23]  ORS 163.150(1)(e) provides:

    "The court shall charge the jury that it may not answer any issue 'yes,' under paragraph (b) [setting out the four questions] of this subsection unless it agrees unanimously."

[24] We do not mean to suggest that the exclusion of relevant evidence could never be harmless or that the grounds for exclusion of otherwise relevant evidence set out in OEC 403 do not apply.

instruct the jury that it must determine whether defendant is intellectually disabled. Following the trial court's ruling at the *Atkins* hearing that defendant was eligible for the death penalty, defendant requested the trial court, in any subsequent penalty-phase proceeding, to ask the jury separately to decide whether it finds that defendant is intellectually disabled and to instruct the jury that an affirmative answer to that question would preclude the possibility of the death penalty. Defendant argued that, under the Eighth Amendment, he had a constitutional right to present evidence of his intellectual disability, and jurors must be instructed in a manner that permits them to consider and give full effect to that evidence. And, defendant contended, under *Atkins*, the full effect of evidence of his intellectual disability is that he is categorically ineligible for the death penalty. Defendant argued that, if the court did not separately instruct the jury about the effect of its finding that he is intellectually disabled, then jurors could conclude that he is intellectually disabled but that he still deserved death. Defendant argued that that result was incompatible with the law and should not be allowed.

The trial court declined to instruct the jury about intellectual disability, ruling that there is no constitutional or other requirement of a separate jury question on that issue. In addition to ruling on that question under the Eighth Amendment, the trial court also concluded that a separate jury question or instruction on the issue of defendant's intellectual disability was not required under the Sixth Amendment.[25]

In this court, defendant argues that both the Sixth and Eighth Amendments to the United States Constitution require a separate jury instruction about intellectual disability. We take the two arguments in turn.

---

[25] The Sixth Amendment to the United States Constitution provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense."

Defendant asserts that the Supreme Court has held that the Sixth Amendment requires that any fact that increases the punishment for an offense beyond the statutory maximum, other than the fact of a prior conviction, must be submitted to the jury and proved beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 US 466, 490, 120 S Ct 2348, 147 L Ed 2d 435 (2000). In addition, under the Sixth Amendment, a defendant has the right to have a jury, rather than a judge, decide on the existence of an aggravating factor that makes the defendant eligible for the death penalty. *Ring v. Arizona*, 536 US 584, 609, 122 S Ct 2428, 153 L Ed 2d 556 (2002). Defendant argues that, if a defendant is ineligible for the death penalty for any reason, including age, insanity, or intellectual disability, then he or she may not be sentenced to death.[26] In the particular case of intellectual disability, defendant argues, under *Atkins*, a court may not impose the death penalty on a capital defendant who asserts intellectual disability unless the trier of fact finds the absence of intellectual disability. If the trier of fact finds that the defendant is intellectually disabled, then the statutory maximum is a sentence of life in prison without the possibility of parole. It follows, defendant contends, that a finding of eligibility for the death penalty is necessary to impose a death sentence, and, therefore, when a defendant asserts his ineligibility for the death penalty, the question must be submitted to the jury and proved beyond a reasonable doubt.

The state responds that defendant's argument takes the narrow exemption from execution that *Atkins* announced, which was based on a mitigating fact (intellectual disability), and attempts to convert it into an element that the state must prove in the negative. That is, the state contends, defendant has turned the analysis on its head, suggesting, essentially, that the absence of a mitigating factor is actually an aggravating factor that the state must prove to the jury

---

[26] ORS 137.707(2) (persons under the age of 18 when the crime is committed are not eligible for the death penalty); *Roper v. Simmons*, 543 US 551, 574-75, 125 S Ct 1183, 161 L Ed 2d 1 (2005) (Eighth Amendment prohibits executing minors); *Ford v. Wainwright*, 477 US 399, 409-10, 106 S Ct 2595, 91 L Ed 2d 335 (1986) (Eighth Amendment prohibits executing the insane); *Atkins*, 536 US at 321 (Eighth Amendment prohibits executing the intellectually disabled).

beyond a reasonable doubt. The state argues that nothing in the Court's case law suggests that, when the law defines a mitigating fact that creates an exemption or departure from the maximum sentence, the state must prove to the jury that that fact does not exist.

We agree with the state that, because intellectual disability is a fact that operates to reduce rather than to increase the maximum punishment permitted by a verdict of guilt, the Sixth Amendment does not require the fact of intellectual disability to be decided by a jury beyond a reasonable doubt. We likewise conclude that the absence of intellectual disability is not an element of a capital offense for purposes of the analysis under *Ring*. Defendant has pointed to nothing in the opinions in either *Apprendi* or *Ring* (or any other case) to suggest that their holdings apply to a situation in which a factual finding operates to lower the maximum allowable punishment rather than to raise the punishment above the statutory maximum.[27] In fact, in *Apprendi*, the Court carefully distinguished between "facts in aggravation of punishment and facts in mitigation," suggesting just the opposite:

> "If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone. Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme."

*Apprendi*, 530 US at 491 n 16 (citation omitted). Like the finding of veteran status that the Court used in its example, a finding of intellectual disability permits the defendant to "escape the statutory maximum." That is, a defendant's intellectual disability reduces the maximum possible sentence

---

[27] Moreover, as defendant concedes, no court that has considered the issue has concluded that the Sixth Amendment requires a claim of intellectual disability under *Atkins* to be resolved by the jury.

from capital punishment to life in prison. Therefore, the absence of intellectual disability is not an element that the state must prove beyond a reasonable doubt.

Defendant also argues that, under the Eighth Amendment, the fact of intellectual disability is conclusively mitigating. That is, he asserts, if a trier of fact finds that a capital defendant is intellectually disabled, then the Eighth Amendment prohibits execution. At the same time, however, as the Court observed in *Atkins* and in *Penry*, evidence of a defendant's intellectual disability "can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." *Atkins*, 536 US at 321; *Penry*, 492 US at 324. For that reason, defendant asserts, the Court in *Penry* suggested that the jury must be instructed in a way that ensures that the jury will be permitted to fully consider the mitigating effect of evidence of a capital defendant's intellectual disability. In defendant's view, that means that the jury must be instructed that it must decide whether a defendant is intellectually disabled and that, if it so finds, defendant is ineligible for the death penalty.

Defendant's argument is based on a faulty premise: that, if the jury were to find, as a factual matter, that he is intellectually disabled, then the Eighth Amendment prohibits his execution. Whether the Eighth Amendment prohibits a defendant's execution is a legal determination, and not a factual one. As the Supreme Court stated in *Hall*, "[t]he legal determination of intellectual disability is distinct from a medical diagnosis," even if it is informed by the medical community's diagnostic framework. 134 S Ct at 2000. And while *Atkins* and *Hall* require that that legal determination be made before an arguably intellectually disabled defendant may be executed, the Court in *Atkins* specifically left it to the states to "develop[] appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 536 US at 317. Nothing in *Atkins*, or in *Hall* or *Penry*, suggests that the Eighth Amendment or any other constitutional provision dictates a particular process, or specifically requires the jury, or even the trial court for that matter, to determine, as a matter of law, a defendant's eligibility for the death penalty. In this case, using a process that defendant acceded

to—the pretrial *Atkins* hearing—the trial court made that legal determination. And, having made that determination, the trial court did not err in refusing to require the jury to decide the matter a second time.[28]

That is not to say that jurors may not make their own determinations as a factual, medical matter, based on the evidence presented, whether defendant is intellectually disabled. As we have previously noted, the Supreme Court pointed out in *Bies* that "[intellectual disability] for purposes of *Atkins*, and [intellectual disability] as one mitigator to be weighed against aggravators, are discrete issues." 556 US at 829. We have already held that defendant was entitled, under ORS 163.150 and the Eighth Amendment, to present evidence of his experts' intellectual disability diagnoses to the jury during the penalty phase of his death penalty trial as mitigating evidence, because that evidence was relevant to the fourth question, whether the defendant should receive a sentence of death. However, because the Eighth Amendment does not require the jury to decide the legal question whether defendant is ineligible for the death penalty because of his intellectual disability,[29] it follows that the trial court did not err in refusing to instruct the jury that it must find whether defendant is intellectually disabled.

---

[28] We do not mean to suggest that it would be error for a trial court to permit the jury to decide the legal question of intellectual disability. That issue is not before us. Rather, we hold here that neither the Sixth nor Eighth Amendment to the United States Constitution requires the jury to make such a determination.

[29] To the extent that defendant's reference to *Penry*, and its statement to the effect that intellectual disability evidence can be a two-edged sword, reflects a further argument that the jury should have been instructed in such a way as to ensure that the jury will treat evidence of intellectual disability as mitigating rather than aggravating, that argument is not preserved. Defendant presented the trial court with two proposed jury instructions concerning mitigation during the penalty phase of his trial: Defendant's Special Jury Instruction No. 1—Definition of Mitigating Evidence, and Defendant's Special Jury Instruction No. 2—Consideration of Evidence in Mitigation. Neither instruction would have informed the jury that it should consider evidence of intellectual disability as mitigating only. Defendant requested that the trial court pose a question to the jury about intellectual disability, but his arguments in court and in his memorandum on that point were confined to ensuring that the jury be instructed that a finding of intellectual disability has a "conclusive mitigating effect," by which defendant specifically meant that, "[i]f the jury finds that a defendant is intellectually disabled, notwithstanding a trial court's previous determination, then the defendant is not eligible for the death penalty."

### 3. *The trial court's exclusion of evidence that Davenport received a life sentence*

The last issue that we address is whether the trial court erred in granting the state's motion *in limine* to exclude evidence during the penalty phase that Davenport received a life sentence for his role in the victim's murder.

In its motion, the state argued that neither Davenport's sentence nor evidence related to his intellectual disability was relevant to any fact at issue in the case. Defendant responded that evidence that an equally or more culpable codefendant received a life sentence was a circumstance of the offense and, therefore, proper mitigation evidence under ORS 163.150 and the Eighth Amendment. The trial court granted the state's motion to exclude evidence, testimony, or argument about Davenport's sentence, deciding that it would not admit the evidence under ORS 163.150 and concluding that the Eighth Amendment did not require its admission.

In this court, defendant reprises the arguments he made below, arguing that both ORS 163.150 and the Eighth Amendment require admission of Davenport's sentence during the penalty phase. We begin our analysis by first considering the matter under the state statute. *State v. Sarich*, 352 Or 601, 617, 291 P3d 647 (2012) (court considers questions of state law before questions of federal law and issues of statutory interpretation before issues of constitutional interpretation). If the statutory source of law provides a complete answer to the legal question presented, we ordinarily decide the case on that basis, rather than turning to constitutional provisions. *Rico-Villalobos v. Guisto*, 339 Or 197, 205, 118 P3d 246 (2005).

As we have stated, during the penalty phase, "evidence may be presented as to any matter that the court deems relevant to sentence including *** any *** mitigating evidence relevant to" the fourth question, whether the defendant should receive a sentence of death. ORS 163.150(1)(a). Although that paragraph permits introduction of *any* mitigating evidence relevant to the fourth question, ORS 163.150(1)(c)(B) provides that the trial court must instruct the jury to answer "no" to the fourth question "if, after considering any aggravating evidence and any mitigating

evidence concerning any aspect of the defendant's character or background, or any circumstances of the offense \*\*\*, one or more of the jurors believe that the defendant should not receive a death sentence." Thus, the universe of "any mitigating evidence" relevant to the fourth question under ORS 163.150(1)(a) is circumscribed by ORS 163.150(1)(c)(B). To be relevant to the fourth question, "evidence must relate to some aspect of the defendant's character or background or to any circumstance of the crime." *State v. Barone*, 328 Or 68, 97, 969 P2d 1013 (1998) (neither victim's personal opposition to death penalty nor expert's opinion that death penalty does not deter violent crime was admissible during defendant's penalty phase hearing because neither was relevant to defendant's character or background or to any circumstance of crime); *State v. Longo*, 341 Or 580, 606-09, 148 P3d 892 (2006) (trial court did not err in excluding evidence relating to defendant's capture and return from Mexico, because it was not relevant to defendant's character and did not make it less likely that he planned the murders).

Evidence is "relevant" under ORS 163.150 if it is relevant under OEC 401. *Stevens*, 319 Or at 580 ("The standard of relevance set forth in OEC 401 applies in penalty-phase proceedings."); *see also McKoy v. North Carolina*, 494 US 433, 440, 110 S Ct 1227, 108 L Ed 2d 369 (1990) (meaning of relevance no different in context of mitigating evidence introduced in capital sentencing proceeding than in any other context). As the Supreme Court stated in *McKoy*, in the context of capital sentencing proceedings, "[r]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a factfinder could reasonably deem to have mitigating value." 494 US at 440. As in noncapital cases, the threshold for relevance in death penalty cases is very low. *Stevens*, 319 Or at 584; *State v. Davis*, 351 Or 35, 48, 261 P3d 1197 (2011) (relevance standard for admissibility is a low bar).

Moreover, in the death penalty context, whether evidence is "mitigating" also is a low standard. Notably, evidence need not necessarily relate to the defendant's guilt for the crime to be mitigating. *Stevens*, 319 Or at 583; *Tennard v. Dretke*, 542 US 274, 285-86, 124 S Ct 2562, 159 L Ed 2d

384 (2004). Rather, as the Supreme Court stated in *Tennard*, the question is whether the evidence "would be 'mitigating' in the sense that it might serve as a basis for a sentence less than death." 542 US at 285 (citations and internal quotation marks omitted). That is, evidence is mitigating "if the sentencer could reasonably find that it warrants a sentence less than death." *McKoy*, 494 US at 441.

*Stevens* illustrates the low threshold for both relevance and mitigation. In that case, the defendant asserted that the trial court had erred in sustaining the state's objection to a question that his lawyer had asked a state's witness on cross-examination, arguing that that evidence was relevant to the fourth question. The witness (the defendant's estranged wife) had been asked to give her opinion about the potential negative effect of the defendant's execution on their daughter. 319 Or at 584. This court acknowledged that that testimony would not offer any direct evidence about defendant's character or background, but concluded that, circumstantially, it could permit a rational juror to infer that there were positive aspects to the defendant's character that could justify a sentence less than death. *Id*. For that reason, the court held that the testimony was sufficiently related to the defendant's character as to be relevant in mitigation.

The question in this case is whether evidence of Davenport's life sentence is similarly relevant in mitigation to the jury's consideration of the fourth question. The state argues that a sentence imposed on a codefendant does not have a tendency to show any aspect of a defendant's character or background, nor does it tend to show any relevant circumstance of the offense. The state contends that a defendant facing the death penalty is entitled to an individualized consideration of whether death is appropriate, which should be based on the defendant's own personal circumstances, his entire personal and criminal history, and his personal culpability for the crime. According to the state, disclosing to the jury that a codefendant received a sentence other than death would be confusing and irrelevant, because the codefendant's sentence would have been based on factual and legal circumstances that were unique to that person. As such, they would have no logical relevance to the appropriate punishment for the defendant.

The state characterizes defendant's argument as positing that, if the jurors in this case found that Davenport was the person primarily responsible for the murder and that defendant himself was only an accomplice, then the jury could conclude, based on the fact that Davenport was sentenced to life in prison, that the death penalty was not an appropriate sentence for him. But, the state responds, the law in Oregon is well established that one who intentionally aids another in the commission of a crime is just as guilty as the person who committed the crime. ORS 161.155(2) (so providing). The state asserts that the personal culpability of the accomplice does not depend at all on whether, or the degree to which, the principal offender also was convicted and punished, and nothing in Oregon law suggests that a person convicted of a crime as an accomplice is entitled to a more lenient sentence than, or even the same sentence as, that imposed on the principal.

Although it is a close question, we conclude that evidence that Davenport received a life sentence is relevant mitigating evidence under ORS 163.150. First, we conclude that Davenport's sentence is relevant to "[an] aspect of the defendant's character or background, or [a] circumstance of the offense" under ORS 163.150(1)(c)(B). The circumstances of the offense include the facts, established during the guilt phase of the trial, that defendant and Davenport jointly participated in the victim's murder and that Davenport was primarily responsible for the victim's death. Davenport volunteered to kill the victim for his gang, he planned the crime, he talked defendant into helping him, and he wielded the instrument that physically caused the victim's death. Davenport's sentence for his participation in the murder, including the reason that he received that sentence—that he was found to be intellectually disabled—are related to those circumstances, because, to the extent that the jury believed that defendant acted under Davenport's influence, they reflect, at least circumstantially, on defendant's own intellectual capacities.

Second, evidence of Davenport's life sentence is mitigating, in the sense that a juror could reasonably find that it warrants a sentence less than death. As we have stated, the question for the jury during the penalty phase,

ultimately, is "whether the defendant should live or die," and the fourth question is a mechanism for the jury "to provide a 'reasoned moral response'" to that question. *Wagner II*, 309 Or at 13. As we have just noted, Davenport was primarily responsible for the victim's death and, defendant argued, talked defendant into participating in the killing. The fact that Davenport did not receive a death sentence because the court determined that he was intellectually disabled reflects indirectly on defendant's own potential intellectual disability and, for the reasons the Court stated in *Penry*, on his moral culpability. That possibly mitigating circumstance is appropriately part of the jury's consideration of whether defendant deserves death.

Because the fact that Davenport received a life sentence for his role in the victim's murder was relevant mitigating evidence under ORS 163.150, the trial court erred in excluding it.[30] On remand, if a new penalty-phase proceeding

---

[30] *State v. Casey*, 108 Or 386, 213 P 771, *motion to recall mandate den*, 108 Or 418, 217 P 632 (1923), cited by the state, is not to the contrary. In *Casey*, the defendant and a codefendant were jointly charged with murder but were tried separately. The defendant was tried first, convicted, and sentenced to death; subsequently, the codefendant was acquitted. The defendant raised various challenges based on the fact of the codefendant's acquittal, but, ultimately, this court held that the codefendant's acquittal was not relevant and did not "in any way affect or mitigate the penalty in the case at bar." *Id*. at 423. *Casey* is not helpful to the state. It did not involve a sentence received by an equally or more culpable codefendant. Rather, the codefendant there expressly was found *not* to be guilty of the crime at all. It therefore sheds no light on the admissibility in a defendant's penalty phase proceeding of evidence that an equally or more culpable codefendant received a sentence less than death.

Additionally, we reject the state's argument that permitting the jury to consider, as mitigation, evidence that an equally or more culpable codefendant received a sentence less than death would be inherently confusing to the jury. Such evidence routinely has been admitted and argued in mitigation in capital cases around the country for decades. In fact, a federal statute and at least one state statute require factfinders in capital murder cases to consider, as a mitigating factor, whether "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death." 18 USC § 3592(a)(4); New Hampshire Criminal Code § 630:5 (VI)(g) (requiring jurors to consider, in determining whether to impose death penalty, whether "another defendant or defendants, equally culpable in the crime, will not be punished by death"). And, although many states do not permit or require evidence of a codefendant's sentence less than death to be considered by the jury, courts in several states either permit consideration of a codefendant's sentence in mitigation or have at least suggested that such evidence is relevant and admissible. *E.g.*, *Brookings v. State*, 495 So 2d 135, 142-43 (Fla 1986) (jurors in capital case may be permitted to consider codefendants' sentences as mitigating factor); *State v. Marlow*, 163 Ariz 65, 72, 786

is required, evidence of Davenport's sentence, including the reason for it, should be admitted as mitigating evidence if introduced.[31]

## III.   CONCLUSION

To summarize, defendant raises 29 assignments of error. We discuss five of those assignments of error in this opinion, and we hold that three are well taken. Specifically, we hold, first, that, although the trial court erred in permitting the prosecutor effectively to depose defendant's codefendant, Davenport, at a pretrial hearing, that error was harmless. Second, we hold that, at defendant's *Atkins* hearing, the trial court used an inappropriate standard in determining that defendant had not met his burden of proving his intellectual disability, and we therefore remand for a new *Atkins* hearing, in which the trial court shall consider the evidence presented in light of the standards set out in the *DSM-5* and discussed in *Hall*. Third, we hold that, during the penalty-phase proceeding below, the trial court erred in refusing to permit defendant's experts to testify that they had diagnosed defendant as having an intellectual disability and that that error was not harmless. Therefore, if the trial court again rules at the conclusion of the *Atkins* hearing that defendant does not have an intellectual disability, a new penalty-phase proceeding will be required. Fourth, we hold that neither the Sixth nor the Eighth Amendment to the United States Constitution requires the trial court to instruct the jury that it must determine whether a defendant has an intellectual disability. Fifth and finally, we hold that the trial court erred during the penalty-phase proceeding in excluding evidence that Davenport received a life sentence for his role in the victim's murder, and that, if introduced at a penalty-phase proceeding on remand, that evidence must be admitted.

---

P2d 395, 402 (1989) (fact that codefendant received lesser sentence, no matter the reason, must be considered by jury and may be found as mitigating circumstance and weighed against any aggravating circumstances, in determining whether to impose the death penalty on defendant); *Howell v. State*, 860 So 2d 704, 762 (Miss 2003) (trial court properly instructed jurors to consider sentence of codefendant as mitigating evidence); *Garden v. State*, 844 A2d 311, 317 (Del 2004) (recognizing codefendant's life sentence as a mitigating factor).

[31] Because we resolve the issue on statutory grounds, we do not reach defendant's constitutional arguments.

The judgment of conviction is affirmed. The sentence of death is vacated, and the case is remanded to the circuit court for further proceedings.